**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOS COYOTES BAND OF
CAHUILLA & CUPEÑO
INDIANS,
        *Plaintiff-Appellee*,

    v.

SALLY JEWELL[*], Secretary of
the Interior; DONALD
LAVERDURE, Acting Assistant
Secretary of the Bureau of
Indian Affairs; DARREN A.
CRUZAN, Deputy Director of
the Office of Justice Legal
Services; SELANHONGVA
MCDONALD, Special Agent in
Charge, District III,
        *Defendants-Appellants*.

No. 11-57222

D.C. No.
3:10-cv-01448-
AJB-NLS

OPINION

Appeal from the United States District Court[*]
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted
May 6, 2013—Pasadena, California

---

  [*] Sally Jewell, Donald Laverdure, and Darren A. Cruzan are substituted
for their predecessors pursuant to Fed. R. App. P. 43(c)(2).

Filed September 4, 2013

Before: John T. Noonan, Kim McLane Wardlaw, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

## SUMMARY[**]

### Bureau of Indian Affairs / Tribal Affairs

The panel reversed the district court's summary judgment
in favor of the Los Coyotes Band of Cahuilla and Cupeño
Indians, and the court's finding that the U.S. Secretary of the
Interior violated the Indian Self-Determination and Education
Assistance Act, the Administrative Procedure Act, and the
Fifth Amendment's guarantee of equal protection when the
Secretary declined to enter into a self-determination contract
with the Tribe to fund law enforcement on the Los Coyotes
Reservation.

The panel held that the Secretary properly rejected the
Tribe's contract request. The panel also held that the Tribe's
reliance on the Indian Self Determination and Education
Assistance Act was misplaced because the Act allows the
Tribe to take control of existing programs and obtain funds
that the Bureau of Indian Affairs ("BIA") would otherwise
spend on those programs, but here there was no existing BIA

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

program, and therefore nothing to transfer to the Tribe. The panel further held that the Administrative Procedure Act did not authorize the court to review the BIA's allocation of law enforcement funding in Indian Country. Finally, the panel held that the BIA's funding policy did not violate the Fifth Amendment's equal protection guarantee.

## COUNSEL

Stuart F. Delery, Acting Assistant Attorney General, Laura E. Duffy, United States Attorney, Barbara C. Biddle, and John S. Koppel (argued), Attorneys, Appellate Staff Civil Division, Department of Justice, Washington D.C., for Defendants-Appellants.

Dorothy Alther (argued), California Indian Legal Services, Escondido, California, for Plaintiff-Appellee.

## OPINION

MURGUIA, Circuit Judge:

### I.

The Secretary of the Interior appeals the district court's decision granting summary judgment in favor of the Los Coyotes Band of Cahuilla and Cupeño Indians (the "Tribe"). The district court found that the Secretary violated the Indian Self Determination and Education Assistance Act ("ISDA"), the Administrative Procedure Act ("APA"), and the Fifth Amendment's guarantee of equal protection when the

Secretary declined to enter into a self-determination contract with the Tribe to fund law enforcement on the Los Coyotes Reservation.

We conclude that the Secretary properly rejected the Tribe's contract request. The Tribe's reliance on the ISDA is misplaced. The ISDA allows the Tribe to take control of existing programs and obtain the funds that the Bureau of Indian Affairs ("BIA") would otherwise have spent on those programs. Where there is no existing BIA program, there is nothing that the BIA would have spent on the program, and therefore nothing to transfer to the Tribe. That there is no existing BIA law enforcement program on the Los Coyotes Reservation is a result of the agency's decision to allocate resources elsewhere. The allocation of those resources is an exercise of agency discretion. As such, while we may engage in a very limited review to determine if the agency's actions complied with constitutional protections such as equal protection, we may not otherwise review the merits of the agency's decision. For these reasons, we reverse.

## A.

It is hard to dispute that Indian Country may be one of the most dangerous places in the United States.[1]  Statistics tell

---

[1] "Indian Country" is defined as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within

only part of the story, and they are saddening: American Indians are victims of violent crime at a rate twice the national average. Steven W. Perry, *American Indians and Crime: A BJS Statistical Profile, 1992–2002* iv (2004).[2] The Department of Justice estimates that American Indians experience rates of violent crime higher than most racial and ethnic groups. U.S. Gov't Accountability Office, GAO–11–252 4 (2011) (hereinafter "GAO Study")

Violence against women is particularly prevalent; in some American Indian communities women are murdered at a rate 10 times the national average. GAO Study at 4–5. Thirty-four percent of American Indian women will be raped during their lifetime, compared to less than one in five women nationwide. Amnesty Int'l, *Maze of Injustice: The Failure to Protect Indigenous Women from Sexual Violence in the USA* 2 (2006). Not only is this number disheartening, it is an underestimate because the actual rate of sexual violence against American Indian women must be even higher as sexual violence is universally underreported. *Id.* at 4. The

---

the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.

[2] That this study is nearly a decade old highlights another problem: there is no consistent and reliable data on crime in Indian Country. U.S. Dep't of Justice Office of Justice Programs, *Compendium of Tribal Crime Data,* 7 (2011). As a result of recent legislation, the Department of Justice is working with state and tribal governments to create a new comprehensive data collection program in Indian Country. *Id.* at 9.

underreporting problem may be much worse in American Indian communities because of chronically underfunded and ineffective law enforcement and distrust of authority. *Id*. The total number (not per-capita) of rapes on the Navajo reservation in 2009 was 10 percent higher than in Detroit—which has a population about four times the size. Timothy Williams, *Washington Steps Back From Policing Indian Lands, Even as Crime Rises*, N.Y. Times, Nov. 12, 2012, at A13.

Not only is sexual violence against American Indian women more common, it is more violent; American Indian women are much more likely than other women to suffer physical injury as a result of sexual violence. Amnesty Int'l, *supra*, at 5. Unfortunately, these victims confront health services that receive a fraction of the funding provided for similar services in other communities and that are ill-equipped to effectively treat victims of sexual violence. *Id.* at 76.

In addition, international drug traffickers exploit the complicated jurisdictional rules and prosecutorial indifference to establish drug distribution operations in Indian Country, often with devastating results for the community. GAO Study, *supra*, at 15. This, in turn, causes even more crime. Sarah Kershaw, *Through Indian Lands, Drugs' Shadowy Trail*, N.Y. Times, Feb. 19, 2006, at 1; *Examining Drug Smuggling And Gang Activity In Indian Country: Hearing Before S. Comm. on Indian Affairs*, 111th Cong. 9–12 (2009) (statement of Ivan D. Posey, Chairman Eastern Shoshone Tribe).

The problem appears to be getting worse. Over the past decade, violent crime has decreased 13 percent nationally, but it has skyrocketed in Indian Country. Williams, *supra*. Over the past decade, homicides have increased 41 percent and rapes have increased 55 percent in Indian Country. *Id.* Gang violence is on the rise in much of Indian Country, creating a new source of crime. Erik Eckholm, *Gang Violence Grows on an Indian Reservation*, N.Y. Times, Dec. 14, 2009, at A14; *Examining the Increase of Gang Activity in Indian Country*: *Hearing Before the S. Comm. on Indian Affairs*, 111th Cong. 50–53 (2009) (statement of Carmen Smith, Chief of Police Warm Springs Tribal Police Department); *Id.* at 46–50 (statement of Sampson Cowboy, Executive Director of Navajo Nation Division of Public Safety).

### B.

There is no single cause of the high level of crime in Indian Country, but two factors relevant to this appeal contribute to the problem: the jurisdictional lines between tribal, state, and federal agencies are confusing and unhelpful, and funding for law enforcement is inadequate. *See* 1–9 Felix S. Cohen, Cohen's Handbook of Federal Indian Law § 9.01 (5th Ed. 2012); Williams, *supra*.

Indian tribes' unique status as domestic dependent nations results in a complex jurisdictional scheme that hampers law enforcement in Indian Country. Cohen, *supra*, § 9.01 ("Unfortunately, the intricate web of laws governing criminal jurisdiction in Indian country can hinder law enforcement efforts." (citation omitted)). A brief overview of the jurisdictional maze is necessary to understand this dispute. As a general rule, Indian tribes are sovereign nations with the

authority to prosecute Indians who commit crimes within tribal jurisdiction. Cohen, *supra*, § 9.04 . Tribes generally lack jurisdiction to prosecute non-Indians. *Id.* (citing *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978)).

Pursuant to numerous statutes, the federal government exercises jurisdiction in Indian Country. Cohen, *supra*, § 9.02. The Indian Country Crimes Act makes the general laws of the United States applicable to Indian Country, but the act only applies if either the victim or defendant—but not both—is an Indian. 18 U.S.C. § 1152; *see also* Cohen, *supra*, § 9.02. The Major Crimes Act creates federal jurisdiction to prosecute certain enumerated crimes committed by Indians within Indian Country, no matter the victim's status. 18 U.S.C. § 1153.

States generally lack jurisdiction over Indian Country. Cohen, *supra*, § 9.03. This rule is subject to some exceptions, the most important being a federal statute known as Public Law 280. *Id.* Public Law 280 explicitly grants six states, including California, authority to enforce criminal laws in Indian Country. 18 U.S.C. § 1162(a); Cohen, *supra*, § 6.04. This complex jurisdictional scheme can interfere with effective law enforcement because confusion over which agency has jurisdiction often results in an incomplete investigation or no investigation at all. Amnesty Int'l, *supra*, at 8; Cohen, *supra*, § 9.01; GAO Study, *supra*, at 13–19 (observing that jurisdictional overlap impedes ability of tribal courts to prosecute crime).

The second problem is a lack of resources. *See* Williams, *supra*. Federal funding for law enforcement in Indian Country is well below the funding level for jurisdictions with

similar populations, despite the fact that Indian Country spans millions of acres. *Id.*; Troy A. Eid & Carrie Covington Doyle, *Separate but Unequal: The Federal Criminal Justice System in Indian Country*, 81 U. Colo. L. Rev. 1067, 1108 (2010) ("The systematic resource gap seriously undercuts the federal government's fundamental criminal justice responsibilities in Indian country and widens when viewed within the broader context of the comparatively limited federal institutions based off-reservation, including federal enforcement, prosecutors, courts, and prisons."). There are fewer than 3,000 tribal and BIA law enforcement officers to patrol over 56 million acres of Indian Country. GAO Study at 5. Recent budget cuts have reportedly exacerbated the problem and have disproportionately reduced federal funding of law enforcement in Indian Country. *The President's Fiscal Year 2013 Budget For Native Programs: Hearing before the S. Comm. on Indian Affairs*, 112th Cong. 1, 2012; Annie Lowery, *Pain on the Reservation*, N.Y. Times July 12, 2013, at B1 ("[N]owhere has the sting [of budget cuts] been felt more severely than on American Indian reservations.").

The record in this case demonstrates that the BIA must prioritize how its limited law enforcement budget is spent. There are over 550 federally recognized tribes, 77 Fed. Reg. 47868–01, and the BIA provides funding for over 200 law enforcement programs. Darren Cruzan, the Deputy Bureau Director of the Office of Justice Services ("OJS"), provided the district court with a declaration explaining how OJS allocates law enforcement funds. OJS considers seven factors: "(1) reported crime rates; (2) staffing-level shortages; (3) size of land base; [(4)] drug/gang activity; [(5)] detention facility shortages; [(6)] recorded calls for services resulting in a reportable incident; and [(7)] operating expenses for new

Department of Justice funded detention facilities." In addition to considering those factors, OJS "must focus its limited dollars to provide direct law enforcement services to tribes in [non-Public Law 280] states because state law enforcement is not available for Indian tribes in those states." Therefore, in non-Public Law 280 states, without federal funding, no law enforcement officer would be available to respond to major crimes in Indian Country.

OJS "generally does not allocate funds for direct law enforcement services to tribes in Public Law 280 states [like California] because the states have ceded partial jurisdiction over the tribes." In these states, local or state law enforcement officers have jurisdiction in Indian Country and federal funding is not essential to ensuring some law enforcement presence.

Cruzan did explain that "a number of tribes [in Public Law 280 states] have obtained federal funds for law enforcement services for various reasons." These reasons are based on unique circumstances relating to certain tribes. For example, the territory of the Fort Mojave Tribe spans the border of California and Arizona. Because Arizona is a non-Public Law 280 state, the BIA funds law enforcement for the Tribe to ensure that the Arizona portion of the reservation receives law enforcement. In another case, the Hoopa Valley Indian Tribe received BIA law enforcement funding despite being in California because of "violent criminal acts related to a dispute over fishing rights." Additionally, some tribes have entered into Self-Governance Compacts and have

allocated a portion of their budget to law enforcement.[3]  As a result of these circumstances a small number of tribes in Public Law 280 states receive some federal law enforcement funding.[4]

Public Law 280 has been criticized as an unfunded mandate, by which the federal government abdicated its role in policing Indian Country and transferred that obligation to the states without providing the resources necessary to discharge it.  Carole Goldberg & Duane Champagne, *Is Public Law 280 Fit for the Twenty-First Century? Some Data at Last*, 38 Conn. L. Rev. 697, 704 (2006).  State governments, including California, appear to have done no better than the federal government in funding law enforcement in Public Law 280 jurisdictions and, as a result, American Indians in Public Law 280 states consistently report

---

[3] Self-Governance Compacts were created by the Tribal Self-Governance Act and allow tribes to negotiate a single funding agreement that gives the tribes broad discretion to administer a variety of programs.  Cohen, *supra*, § 22.02 (citing 25 U.S.C. §§ 458aa–458aaa-18.).  The Compacts give the tribes a block of funding that they can allocate as they see fit, thus allowing tribes in Public Law-280 states to allocate a portion of their funds to law enforcement, even if the BIA would not have otherwise funded law enforcement on the reservation.  *Id.*  There is no evidence that the Los Coyotes Tribe has applied for a Self-Governance Compact.

[4] The parties dispute whether the BIA has an "unwritten policy" not to fund law enforcement in Public Law 280 states.  The dispute is semantic, however, because there is no disagreement about how the OJS currently allocates funds: most of the funds go to non-Public Law 280 states, but there are exceptions in the unique circumstances discussed.  Whether this funding priority is described as an "unwritten policy" does not change the outcome of this case.

that state law enforcement is unavailable or slow to respond. *Id*. at 711–14. The record in this case confirms these findings. According to the Tribe, the Los Coyotes Reservation "has previously been the site of murders, theft, shooting narcotics[,] and other violent and non[-]violent crimes." The Reservation comprises about 40,000 acres of secluded and hilly land that is patrolled by a single full-time tribal law enforcement officer who is often asked to pay for training and equipment out of his own pocket. Moreover, the inability of the County Sheriff's office to pay overtime limits its officers' ability to respond and investigate crimes on the reservation.[5] Tribal members report that they often wait up to two hours for a sheriff's officer to respond to a call.

Recognizing the problem of crime in Indian Country, Congress passed the Tribal Law and Order Act of 2010. Pub. L. No. 111-211, 124 Stat. 2261 (Jul. 29, 2010) (codified as amended in various sections of 18 U.S.C., 21 U.S.C., 25 U.S.C., 28 U.S.C., and 42 U.S.C.). The Act generally sought to improve cooperation between federal law enforcement and tribes. Gideon M. Hart, *A Crisis in Indian Country: An Analysis of the Tribal Law and Order Act of 2010*, 23 Regent U. L. Rev. 139, 169 (2011). For example, the Tribal Law and Order Act created the BIA's Office of Justice Services. 25 U.S.C. § 2802(b). Additionally, the Act gives tribes in Public Law 280 states the option of requesting that the Attorney General accept concurrent jurisdiction over law enforcement in their territory. 18 U.S.C. § 1162(d). For example, the Department of Justice recently granted the

---

[5] The State of California and the County of San Diego are not parties to this litigation and we appreciate the fact that they too face severe fiscal constraints.

request of the White Earth Nation to accept concurrent jurisdiction over the White Earth Reservation located in Minnesota, a Public Law 280 state. *United States to Accept Concurrent Jurisdiction Over White Earth Reservation in Minnesota*, Dep't of Justice, (March 15, 2013) http://www.justice.gov/opa/pr/2013/March/13-opa-315.html.

Nonetheless, the Act falls short of resolving many of the problems that result in high crime in Indian Country. *See* Hart, *supra*, at 176–84; *Tribal Law and Order*, N.Y. Times, Aug. 2, 2010, at A16. In particular, the Act reportedly fails to confront the shortage of resources that prevents effective law enforcement in Indian Country. *Lawlessness on Indian Land*, N.Y. Times, Nov. 22, 2012, at A34; Timothy Williams, *Higher Crime, Fewer Charges on Indian Land*, N.Y. Times, Feb. 20, 2012, at A14; Jasmine Owens, *"Historic" in a Bad Way: How the Tribal Law and Order Act Continues the American Tradition of Providing Inadequate Protection to American Indian and Alaska Native Rape Victims*, 102 J. Crim. L. & Criminology, 497, 519 (2012).

## C.

The Indian Self Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 450, *et seq.*, was designed to reduce the "Federal domination of Indian service programs." 25 U.S.C. § 450; *see also Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2186–87 (2012) (describing the purpose of the ISDA). To achieve that goal, the statute created a system by which tribes could take over the administration of programs operated by the BIA. Under this system, a tribe that is receiving a particular service from the BIA may submit a contract proposal to the BIA to take over the program and

operate it as a contractor and receive the money that the BIA would have otherwise spent on the program. If certain conditions are met, the Secretary of the Interior must approve the contract request. 25 U.S.C. § 450f(a)(1). These contracts are known as 638 contracts, after the Public Law that created them. Cohen, *supra*, § 22.02 (citing Pub L. No. 93-638, 88 Stat. 2203 (1975)). The ISDA covers a range of services and the BIA has entered into over one hundred 638 contracts with tribes relating to law enforcement.

The ISDA directs the Secretary to "approve the proposal and award the contract" unless the Secretary makes a "specific finding that clearly demonstrates" that there is a statutory basis to reject the contract. 25 U.S.C. § 450f(a)(2). The statutory basis for rejection relevant to this case is § 450f(a)(2)(D), which allows the Secretary to reject a contract application if "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract." 25 U.S.C. § 450f(a)(2)(D). The "applicable funding level" is the amount that the BIA would have spent on the program if it did not enter the contract with the tribe. 25 U.S.C. § 450j-1(a). Therefore, § 450f(a)(2)(D) limits the amount of money that a tribe may obtain under a 638 contract to the amount that the BIA is currently spending on the program in existence for which the tribe seeks to obtain a contract to operate.

If the contract application is denied, the Secretary must allow the tribe to appeal the decision. 25 U.S.C. § 450f(b)(3). Tribes may elect to forgo the administrative appeal and "initiate an action in a Federal district court." *Id.* To that end, the ISDA grants district courts broad jurisdiction to enforce the provisions of the Act. 25 U.S.C. § 450m-1(a).

D.

The Los Coyotes Band of Cahuilla and Cupeño Indians is a federally recognized tribe located on the Los Coyotes Indian Reservation in a "very secluded rural area of San Diego County." The Reservation was established in the early 1900's. As early as 1934, the Tribe requested that the BIA appoint a law enforcement officer to the reservation, but the request was denied because funds were not available. With the passage of Public Law 280, California obtained criminal jurisdiction over the Reservation, and the Tribe is entitled to the same law enforcement services as any other community in the county. According to the Tribe, the promise of Public Law 280 has been largely empty, and the sheriff's response to complaints of criminal activity on the reservation is slow or non-existent.

In 2004, the Tribe received a grant under the Department of Justice's Community Oriented Policing Services ("COPS") program to fund a part-time police officer, which "had a slight effect in deterring crime."[6] The grant has expired, but the Tribe is able to continue employing the officer on a limited basis without federal funds. The officer received a Special Law Enforcement Commission ("SLEC") from the BIA, which delegates the BIA's authority to enforce federal criminal law in Indian Country to tribal police officers. *See*

---

[6] The COPS grant has expired and the Tribe did not attempt to convert that funding into a 638 contract, but it would have been unsuccessful had it tried because the COPS program is "not a federal program designed specifically to benefit Indians," *see Navajo Nation v. Dep't of Health & Human Servs., Sec'y*, 325 F.3d 1133, 1138 (9th Cir. 2003) (en banc) (holding that grants to tribes under the Temporary Assistance for Needy Families are not contractable under the ISDA).

25 U.S.C. § 2804(d); *Hopland Band of Pomo Indians v. Norton*, 324 F. Supp. 2d 1067, 1068 (N.D. Cal. 2004).[7]

Because of the continuing crime on the Los Coyotes Reservation, the Tribe applied for a 638 contract under the ISDA, seeking $746,110.00 to increase law enforcement on the reservation. The BIA denied the contract application. The BIA explained that it was denying the contract pursuant to 25 U.S.C. § 450f(a)(2)(D), because "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under [§] 450j-1(a) of this title." In other words, the BIA rejected the contract because the Tribe requested more money for the program than the BIA is currently spending on the program. In fact, there was no currently existing BIA program that the Tribe sought to take over. The Tribe was attempting to create a new BIA program, which they have been trying to do for decades; however, their current attempt utilizes a statute that governs existing programs and does not create new ones.

The BIA explained that the "amount of money that the BIA's Office of Justice Services spends in California for law enforcement services is zero." The letter continued, "[t]he principal reason for this is that, as you know, California is a [Public Law] 280 state, and so the cost of law enforcement on Indian reservations is borne by the State, not the BIA." The BIA clarified that it was not arguing that it was unable to enforce federal laws in Indian Country in California, but

---

[7] Because the SLEC does not involve the expenditure of any BIA funds, it does not contribute to the "applicable funding level" of the contract request.

rather that the BIA "does not spend any money for law enforcement on Indian reservations in the State."

The BIA's letter advised the Tribe of its right to appeal the determination. According to BIA regulations, the Tribe could request an "informal conference," 25 C.F.R. § 900.153, or it could appeal to the Interior Board of Indian Appeals ("IBIA"), 25 C.F.R. § 900.152. The Tribe opted for an informal conference, which was mediated by Steven Haberfeld, a mediator employed by Indian Dispute Resolution Services, Inc. Haberfeld issued a Written Report and Recommended Decision, which recommended that the BIA "respond to current realities" and "make the proper adjustments," by abandoning the "unwritten discriminatory policy" of not funding law enforcement in Public Law 280 states. Haberfeld directed the Secretary to "seek additional funding from Congress, if it is needed, to provide more 638 funds for law enforcement services on a non-discriminatory basis."

The BIA appealed the decision to the IBIA. The IBIA, interpreting BIA regulations, held that it lacked jurisdiction because the BIA does not have the right to appeal the recommendation of the mediator in an informal conference. The BIA responded by sending a letter to the Tribe's counsel stating that because it had no right to appeal Haberfeld's decision, it was treating the decision as non-binding and that the BIA did "not intend to comply with [Haberfeld's] gratuitous recommendation that, moreover, failed to address the controlling legal considerations at issue."

E.

About six months later, the Tribe filed a complaint in district court alleging five causes of action: (1) violation of the ISDA based on the BIA's policy of not funding law enforcement in Public Law 280 states, allegedly imposing an impermissible "nonregulatory" condition on 638 contracts; (2) violation of the Administrative Procedure Act and the ISDA based on the theory that the funding policy was not properly promulgated under the notice and comment procedure of the APA; (3) a claim that the denial of the 638 contract was "arbitrary, capricious, and contrary to law"—in violation of the APA; (4) a denial of equal protection in violation of the Fifth Amendment; and (5) a violation of the Secretary's trust responsibility to provide the Tribe law enforcement.  The parties filed cross-motions for summary judgment and the district court granted summary judgment in favor of the Tribe on the ISDA claim, the two APA claims, and the equal protection claim.  The district court granted summary judgment in favor of Defendants on the trust responsibility claim.

II.

A.

We review a district court's grant of summary judgment de novo. *Holihan v. Lucky Stores, Inc.*, 87 F.3d 362, 365 (9th Cir. 1996).  "Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute and the district court correctly applied the relevant substantive law." *Id.*

B.

The Secretary denied the Tribe's contract request because the Tribe requested a contract for a program that was not currently being funded by the BIA. Section 450f(a)(2)(D) authorizes the Secretary to reject a contract if the Tribe requests more money than the BIA is currently spending on the program. The purpose of § 450f(a)(2)(D) is clear: the ISDA does not require the Secretary to increase the amount of money it spends on any program, it simply requires the Secretary to transfer control of that program to a requesting tribe. For example, if the BIA spends $500,000 on law enforcement on a reservation, the Secretary can decline a contract request if the tribe asks for $700,000 to take over law enforcement on the reservation. In that scenario, the Tribe would be entitled only to a contract for $500,000. In this case, there is currently no federal program at all and the BIA spends no money on law enforcement on the reservation. Rather than attempting to transfer a program from the control of the BIA to the Tribe, the Tribe here is attempting to use the ISDA to create a program that does not exist. This is inconsistent with the ISDA, which requires that the Tribe first obtain BIA funding for a program, and then request a contract to operate the program.

The Tribe's argument that the Secretary failed to comply with the ISDA is unconvincing. The Tribe points to a few provisions of the ISDA that do not provide a basis to reject the contract request. For example, a "self-determination contract" is defined as a "contract . . . entered into . . . between a tribal organization and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and

their members pursuant to Federal law." 25 U.S.C. § 450b(j). The Tribe claims that because this definition does not include the phrase "which are currently being provided directly to the tribe or tribal organization," there is no requirement that the program currently exist. Similarly, the Tribe points to 25 U.S.C. § 450f(a)(1), which requires the Secretary to enter into self-determination contracts.

These provisions are not helpful to the Tribe because the Secretary has never cited them to justify denying the contract request. The Tribe could cite to a variety of subsections of the statute that do not justify rejecting the contract request, but that would not change the outcome here because they do not undermine the statutory basis to reject the Tribe's request—25 U.S.C. § 450f(a)(2)(D) (providing that the Secretary may reject a contract request if the Tribe requests more than is currently being spent on the program).

The Tribe's only response to § 450f(a)(2)(D) is that the BIA misinterprets 25 U.S.C. § 450j-1(a)(1), which defines "applicable funding level." Section 450j-1(a)(1) states that "[t]he amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract." 25 U.S.C. § 450j-1(a)(1). According to the Tribe, because § 450j-1(a)(1) does not contain the phrase "currently allocating," there is no requirement that the BIA currently fund the program. While this section does not state the words "currently allocating," the phrase the statute does include— "would have otherwise provided"—leads to the same result. The Secretary is only required to fund the contract with the

amount that the BIA would have otherwise spent on the program. In this case, the BIA would have provided no money for law enforcement on the reservation and the applicable funding level is therefore zero.

Additionally, the Tribe offers no viable alternative reading of the statute. If the ISDA does not limit the contract amount to the current level of funding, then § 450f(a)(2)(D) becomes meaningless—a result that we must avoid. *See Gorospe v. C.I.R.*, 451 F.3d 966, 970 (9th Cir. 2006) (observing that courts should avoid interpreting a statute in a way that renders a provision meaningless). The Tribe's reading would also lead to the illogical result that the Secretary must fund every contract request, for any amount—another result we must avoid. *See Aponte v. Gomez*, 993 F.2d 705, 708 (9th Cir. 1993) (observing that courts should avoid interpreting a statute in a way that leads to absurd results).

The district court concluded the BIA violated the ISDA despite the fact that § 450f(a)(2)(D) allowed the BIA to reject the contract application. The district court stated "that Plaintiff is challenging neither the declination itself nor Defendants' stated reason for it, but rather the underlying policy—i.e., the reason why the 'applicable funding level' is zero." In other words, the district court concluded that the Secretary complied with the ISDA, but that the Tribe's actual claim is based on the fact that the Secretary does not (and never has) funded law enforcement on the Los Coyotes Reservation because it is located in California. We disagree because the ISDA does not require the BIA to fund law enforcement on the Los Coyotes Reservation.

The Tribe argues that the BIA's funding policy creates a "nonregulatory requirement," which is prohibited by § 450k(a)(1) of the ISDA. To support this argument, the Tribe relies on *Ramah Navajo School Board v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996). While *Ramah* involved the ISDA, it is otherwise distinguishable. As part of the Ramah Navajo School Board's existing 638 contract, the School Board was entitled to Contract Support Funds ("CSF") that covered costs the government would incur if it ran the program, but were not directly spent on the program. *Id.* at 1341 (citing 25 U.S.C. § 450j-1). The statutory provisions relating to CSF funding were mandatory and "forbade the Secretary to reduce the amount of funding for virtually any reason except a reduction in appropriations or tribal authorization." *Id.* at 1342 (citing 25 U.S.C. § 450j-1(b)(2)).

To accommodate a budget shortfall for CSF funds, the BIA set a deadline for tribes to apply for CSF funding and announced that it would fund only 50% of late requests. *Id.* at 1343. The D.C. Circuit held that a subsection that stated "the provision of funds under [the Act] is subject to the availability of appropriations," 25 U.S.C. § 450j-1(b), did not allow the BIA to ignore the statutory formula. Instead, the subsection simply required the BIA to allocate only the funds it was appropriated, and any shortfall was to be deducted pro-rata from all allocations. *Ramah*, 87 F.3d at 1345–46.[8] The court acknowledged that it could only review the BIA's

---

[8] The D.C. Circuit noted that if the "subject to availability" clause had the meaning suggested by the BIA, it would lead to the odd result that in years that CSF funds were fully funded by Congress the BIA had absolutely no discretion, but if there was any shortfall—no matter how small—the BIA had total discretion. *Id*. at 1348.

decision if it had "meaningful law to apply," but held that the ISDA's statutory funding formula was such a law. *Id.* at 1347–48.

The court determined that the penalty for a late submission was a "nonregulatory requirement" that violated § 450k(a)(1) of the ISDA, stating:

> Rather than announcing a general policy, the Notice imposes on the Tribes a "requirement" in the truest sense of the word; under the 1995 plan, Tribes are *required* to meet the new June 30 deadline or accept a 50% reduction in their CSF entitlement.

*Id.* at 1350.

This case does not involve an existing 638 contract. Thus, there cannot be a violation of the statutory provisions analyzed in *Ramah* because those provisions directed the BIA to provide CSF funds to tribes that already had 638 contracts. Moreover, in this case, there is no "requirement" that the Tribe take any action. *Cf. Ramah*, 87 F.3d at 1350. The contract was not denied because the Tribe failed to do something required by the BIA, but because the amount requested exceeded the amount currently spent on the program—a statutory basis for rejecting the contract. Further, there is no "meaningful law to apply" to the BIA's allocation of funds for law enforcement. *Cf. Ramah*, 87 F.3d at 1347–48. The ISDA is silent on how the BIA should prioritize its funding of law enforcement.    In fact, § 450f(a)(2)(D) ensures that the ISDA does not require the

BIA to spend more money on a particular program than it would have otherwise spent on that program.

No reading of the ISDA authorizes federal courts to grant relief when the Secretary properly denies a contract, but the Tribe complains of some "underlying policy" behind the circumstances that made the denial possible.  Such an interpretation transforms the ISDA from a tool that allows tribes to take over federally run programs to a tool that allows tribes to demand a contract for a program that does not exist—and then challenge any denial based on the "underlying policy" that caused the program not to exist in the first place.  Unfortunately for the Tribe, this result is unworkable and without legal support.

## C.

The Tribe's argument that the BIA's failure to fund law enforcement on the Los Coyotes Reservation was a violation of the APA is foreclosed by Supreme Court precedent.  In *Lincoln v. Vigil*, the Court held that courts may not use the APA to review an agency's decision to allocate funds absent some statutory constraint on the agency's discretion. 508 U.S. 182, 190–94 (1993).  *Lincoln* involved a discontinued program that had been operated by the Indian Health Service.  *Id.* at 186–88.  The Supreme Court unanimously rejected an APA challenge to the discontinuation brought by children that had received services from the program because the decision to discontinue the program was "committed to agency discretion by law." *Id.* at 193 (quoting 5 U.S.C. § 701(a)(2)).  The Court held:

> The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.

*Id.* at 192; *see Serrato v. Clark*, 486 F.3d 560, 568–70 (9th Cir. 2007) (applying *Lincoln*). The Court's decision was based on the fact that:

> an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources" to fund a program "at all."

*Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). As a court, we are institutionally ill-equipped to consider these factors. *Id.* The Tribe does not identify any specific appropriation it believes should have been allocated for law enforcement on the reservation, let alone specific language in an appropriation that deprives the Secretary the discretion to allocate the funds. The BIA's

funding decisions are therefore unreviewable acts of agency discretion.

The district court attempted to distinguish *Lincoln* on the grounds that "this case is not about the allocation of funds, but rather the *eligibility* to be considered for a 638 contract in the first place."**⁹** That line of reasoning is circular. The district court avoided binding precedent forbidding courts from reviewing discretionary funding decisions by framing the issue as one of eligibility for an ISDA contract. But, as explained in Section II B, the district court avoided the clear language of the ISDA by stating that the true issue was not contract eligibility, but instead, the underlying funding policy. The APA does not authorize us to review the BIA's allocation of law enforcement funding in Indian Country.

The Tribe also argues that the BIA violated the APA by creating an unwritten policy to not fund law enforcement in Public Law 280 states, but failing to formally promulgate that policy under the APA's notice and comment procedure. Even assuming the BIA has a "policy" of not funding law enforcement in Public Law 280 states, it is a "general statement of policy" because it "merely provides *guidance* to agency officials in exercising their discretionary powers

---

**⁹** The district court repeated similar statements, noting, "the Court is not directing Defendants to allocate funds, so their discretion to do so is not affected," and "[t]o be clear, the Court is not requiring that Defendants issue the contract or otherwise dictating how Defendants should allocate their funds." The district court further stated that "[i]nstead, to level the playing field and ensure that Plaintiff's request receives a fair evaluation, the Court enjoins Defendants from using California's [Public Law] 280 status as the sole reason for declining Plaintiff's contract proposal."

while preserving their flexibility and their opportunity to make 'individualized determination[s].'" *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (alteration in original) (citation omitted). Such a policy is not subject to the notice and comment requirements of the APA. 5 U.S.C. § 553(b)(3)(A).

Finally, the Tribe argues that the unwritten policy was applied arbitrarily, in violation of the APA. That the agency makes exceptions to the rule, however, suggests that the policy is a general statement of policy that preserves the agency's flexibility. And, in any event, the BIA was given a lump-sum to allocate as it saw fit, making its allocation unreviewable under the APA. *Lincoln*, 508 U.S at 190–91 (citing 5 U.S.C. § 701(a)(2)).[10]

D.

The Tribe argues that the BIA's funding policy violates the Fifth Amendment's equal protection guarantee. The district court identified two possible theories that would

---

[10] Even if we reviewed the funding decision, APA review "is narrow and a court is not to substitute its judgment for that of the agency." *Peck v. Thomas*, 697 F.3d 767, 772 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1289 (2013) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency must show that it had a reasonable basis for its decision; that is, it must show that "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (quoting *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008)). The uncontroverted Cruzan declaration carries this burden.

support an equal protection challenge: (1) unequal treatment of the Tribe as compared to tribes in non-Public Law 280 states, and (2) unequal treatment of the Tribe as compared to other tribes in Public Law 280 states.[11]  Both theories fail.

An equal protection challenge to the Government's allocation of funds must overcome a "strong presumption of constitutionality." *Mathews v. De Castro*, 429 U.S. 181, 185 (1976).  The decision to allocate funds is subject to rational basis review.  *Id*.  The Secretary has no burden to affirmatively prove a justification for the funding decision. Instead, the Tribe bears the burden "to negative every conceivable basis which might support" the distinction in funding. *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)).[12]

The first theory fails because there is a meaningful distinction between Public Law 280 states and non-Public

---

[11]  The Tribe does not argue, and we therefore do not consider, the argument that American Indians as a whole are denied equal protection based on the lack of effective law enforcement in Indian Country.  *See* Eid & Covington Doyle, 81 U. Colo. L. Rev. at 1108 (arguing that American Indians, as a whole, are denied equal protection).

[12]  The Tribe relies on *Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934 (N.D. Cal 1979), *aff'd sub nom. Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir. 1980).  The Ninth Circuit affirmed based on a statute, and did not reach the constitutional issue. 618 F.2d at 573.  The district court's decision is not binding on this Court and appears to have improperly placed the burden on the Government. *See* 464 F. Supp. at 937–39.  Even if considered persuasive, the district court's decision has no bearing on this appeal because it analyzed the particular justification for unequal funding presented in that case.

Law 280 states: in the latter, states cannot exercise criminal jurisdiction in Indian Country. That distinction provides a rational basis for prioritizing law enforcement funding in non-Public Law 280 states. The Tribe's assertion that California fails to adequately fulfill its law enforcement obligation might be true, but it says nothing about whether the limited federal funds are still rationally directed to states that have absolutely no state law enforcement.

The second theory also fails because the Tribe has not negated the reason that the Secretary gave for funding some tribes in Public Law 280 states. A portion of the tribes in Public Law 280 states that receive law enforcement funding are tribes that span a state border and are partially in a non-Public Law 280 state. The Tribe's argument that there is no requirement that the funds be spent in any particular state misses the mark. The Secretary must only provide a basis for making the distinction between tribes, and the fact that some tribes have a portion of their jurisdiction that is outside the reach of state law enforcement is a sufficient basis.

To the extent the record suggests that other tribes in Public Law 280 states were given some law enforcement funds, the specific reasons for those allocations are explained in the Cruzan declaration and are not rebutted or even discussed by the Tribe.

III.

If the question is whether the Secretary's declination of the Tribe's contract application complied with the ISDA, the answer is yes because the Tribe requested more money than the BIA would have spent on law enforcement on the

reservation. If the question is whether the BIA should have spent money on law enforcement on the reservation, it is simply not our role to answer. We have serious doubts that the funding of law enforcement on the Los Coyotes Reservation is adequate, but that problem is unfortunately not unique to this Tribe. The Tribe has presented no legal theory that allows us to review the level or distribution of funding for law enforcement in Indian Country.

**REVERSED**.