**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOREN R. SHIRK; JENNIFER ROSE, individually and as husband and wife, *Plaintiffs-Appellants*, v. UNITED STATES OF AMERICA, on behalf of its agency, Department of Interior, Bureau of Indian Affairs, *Defendant-Appellee*. | No. 10-17443 D.C. No. 2:09-cv-01786-NVW OPINION |

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
June 12, 2014—San Francisco, California

Filed December 8, 2014

Before: Diarmuid F. O'Scannlain, Robert D. Sack[*],
and Carlos T. Bea, Circuit Judges.

---

[*] The Honorable Robert D. Sack, Senior Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

Opinion by Judge O'Scannlain;
Concurrence by Judge Sack;
Partial Concurrence and Partial Dissent by Judge Bea

## SUMMARY[**]

### Federal Tort Claims Act

The panel vacated the district court's dismissal for lack of subject matter jurisdiction of a Federal Tort Claims Act action brought against the United States after Jennifer Rose was injured in a traffic accident following a police pursuit involving two tribal police officers employed by the Gila River Indian Community.

Loren Shirk, along with his wife, Jennifer Rose, alleged negligence by the tribal officers and loss of consortium under the FTCA. Congress extended the FTCA's waiver of the United States' sovereign immunity to claims resulting from the performance of functions authorized by the Indian Self-Determination and Education Assistance Act of 1975, commonly referred to as § 314.

To decide whether the tribal officers' conduct was covered by § 314, thereby subjecting the United States to potential tort liability, the panel held as an issue of first impression, that it was first necessary to set out the analysis that courts should undertake when confronted with a § 314 claim where the alleged tortfeasors are employees of a tribe,

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

tribal organization, or Indian contractor. The panel held at the first step of the § 314 inquiry, courts must determine whether the alleged activity is, in fact, encompassed by the relevant federal contract or agreement. At the second step, courts must decide whether the allegedly tortious action fell within the scope of the tortfeasor's employment under state law. The panel held that if both of these prongs were met, the employee's actions were covered by the FTCA; but a plaintiff's failure at either step was sufficient to defeat subject matter jurisdiction. The panel remanded so that the parties could fully brief the issue and the district court could conduct a new analysis of its subject matter jurisdiction using this two-step framework.

Second Circuit Judge Sack concurred, and wrote only to register his doubts as to one of the district court's conclusions which the panel's opinion properly did not reach. If the panel were squarely presented with the issue, Judge Sack would conclude that the relevant agreements between the federal government and the tribe authorized the enforcement of Arizona state law by tribal police officers.

Judge Bea concurred in part, and dissented in part. Judge Bea agreed with the new two-part test articulated by the majority opinion, but he would not remand because there are no issues of fact that require remand.

## COUNSEL

Bradley M. Rose, Kaye, Rose & Partners, LLP, Los Angeles, CA., argued the cause for the plaintiffs-appellants. Trinette S. Sachrison, Kaye, Rose & Partners, LLP, San Diego, CA, filed the briefs for the plaintiffs-appellants. With her on the briefs was Bradley M. Rose, Kaye, Rose & Partners, LLP, Los Angeles, CA.

Jeffrica Jenkins Lee, U.S. Department of Justice Civil Division, Washington, DC, argued the cause and filed the brief for defendant-appellee. With her on the brief were Stuart F. Delery, Assistant Attorney General, U.S. Department of Justice Civil Division, Washington, DC; John S. Leonardo, United States Attorney, Phoenix, AZ; and Barbara C. Biddle, U.S. Department of Justice Civil Division, Washington, DC.

Thomas L. Murphy, Deputy General Counsel, Gila River Indian Community, Sacaton, AZ, argued the cause and filed the brief on behalf of amicus curiae Gila River Indian Community in support of plaintiffs-appellants. With him on the brief was Linus Everling, General Counsel, Gila River Indian Community, Sacaton, AZ.

## OPINION

O'SCANNLAIN, Circuit Judge:

We are asked to decide whether the United States may be held liable under the Federal Tort Claims Act for the off-reservation actions of two tribal police officers.

## I

## A

On October 19, 2006, at approximately 5:00 p.m., Detective Michael Lancaster and Sergeant Hilario Tanakeyowma (the "Officers"), two tribal police officers employed by the Gila River Indian Community ("GRIC" or the "Community"), were traveling northbound on State Route 587 in a GRIC Police Department vehicle.[1] They had attended a mandatory police counter-terrorism training class in Tucson, Arizona, and were returning to Sergeant Tanakeyowma's residence in Chandler, Arizona.

As the Officers approached the intersection of Chandler Heights Road and State Route 87/Arizona Avenue, outside the boundaries of the GRIC reservation, they observed a white compact vehicle driving erratically. The driver of the vehicle was later determined to be Leshedrick Sanford, a paroled felon. The Officers began to pursue Sanford. When Sanford came to a stop at a red light at the intersection of Ocotillo Road and State Route 87/Arizona Avenue, the Officers pulled up behind him. As described by the Officers, Detective Lancaster exited the police vehicle to "make contact" with Sanford, but Sanford accelerated and drove through the red light into the intersection. Sanford collided with Loren Shirk, who was traveling eastbound on Ocotillo Road on a motorcycle. Shirk was thrown from his motorcycle and sustained serious physical injuries as a result of the collision.

---

[1] We take the facts verbatim from the district court's order, with only slight additions and modifications.

Sanford, who was under the influence of alcohol, immediately fled the scene on foot, but he was apprehended and arrested by the Officers shortly thereafter. He subsequently pleaded guilty to one count of aggravated assault with prior felony convictions and one count of leaving the scene of a serious injury accident, both in violation of Arizona law. Sanford was sentenced to eighteen years in prison.

B

Shirk, along with his wife, Jennifer Rose (together, "Shirk"), filed suit against the United States, alleging negligence by the Officers and loss of consortium under the Federal Tort Claims Act (FTCA). Shirk claimed that the Officers were employees of the Bureau of Indian Affairs (BIA) for purposes of the FTCA and, as such, that the United States was liable for the Officers' purported negligence. The United States moved to dismiss the complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). On August 27, 2010, the district court issued an order granting the government's motion to dismiss and entered judgment for the United States. Shirk timely appealed.

II

Shirk alleges that the Officers acted negligently when they encountered Sanford and that such negligence resulted in Shirk's injuries. According to Shirk, the United States is liable for the Officers' negligence because they were "acting within the scope of their employment in carrying out" various contracts and agreements between the United States and the GRIC. 25 U.S.C. § 450f (note). We begin our analysis of

Shirk's allegations by explaining the statutes and agreements at issue.

A

The federal government has long provided a series of services to Indian tribes. Philip P. Frickey et al., *Cohen's Handbook of Federal Indian Law* § 22.01[1] (2012 ed.). The New Deal began a period in which, with some "fluctuations in policy," there has been a "continuous decentralization of government services to Indians." *Id.*

This decentralizing trend accelerated dramatically with the passage of the Indian Self-Determination and Education Assistance Act of 1975 ("ISDEAA"). *Id.* The ISDEAA "created a system by which tribes could take over the administration of programs operated by the [Bureau of Indian Affairs]." *Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell*, 729 F.3d 1025, 1033 (9th Cir. 2013). A tribe "receiving a particular service from the BIA may submit a contract proposal to the BIA to take over the program and operate it as a contractor and receive the money that the BIA would have otherwise spent on the program." *Id.* The Department of Interior, in which the BIA is housed, is required to enter into such contracts upon the request of a tribe unless one of five exceptions applies. *Id.*; 25 U.S.C. § 450f(a)(2). These contracts are commonly called "638 contracts," in reference to the public law number of the ISDEAA. *See* Indian Self-Determination and Education Assistance Act, Pub. L. 93-638, 88 Stat. 2203 (Jan. 4, 1975).

Congress permitted even greater decentralization when it enacted the Tribal Self-Governance Act of 1994 as an amendment to the ISDEAA. The Act allows certain tribes to

enter into self-governance compacts.  25 U.S.C. § 458bb. Such compacts become the basis for annual funding agreements that "give the tribes a block of funding that they can allocate as they see fit," *Los Coyotes Band of Cahuilla & Cupeño Indians*, 729 F.3d at 1031 n.3, thus ensuring greater tribal control over the design and implementation of compact programs.  *See* 25 U.S.C. § 458cc(b)(1)–(2) (authorizing tribes to "plan, conduct, consolidate, and administer [certain] programs, services, functions, and activities, or portions thereof").

These statutes are the source of the agreements at issue in this case, and it is those agreements which allegedly give rise to FTCA liability.

B

Pursuant to the ISDEAA, the GRIC and the United States entered into a 638 contract in 1998.  The purpose of the contract was "to provide Law Enforcement Services for the Gila River Indian Community."  Such services were to be provided "in accordance with [the] attached Statement of Work."  *Id.* § (b)(3).  The Statement of Work, in turn, describes four distinct law enforcement programs covered by the contract: Uniformed Police, Detention Services, Communications, and Criminal Investigations.  The contract enumerates specific duties and limitations that attach to each program.  For instance, the uniformed police are charged with the "enforcement of Federal laws and [the] laws of the [GRIC]," and this includes "[p]atrol services on and off roadways and in the communities within the boundaries of the Reservation."

In 2003, the GRIC decided to take advantage of the increased tribal authority that comes with agreements negotiated under the Tribal Self-Governance Act. It entered into a compact with the United States that enabled the GRIC to "design those programs, functions, services and activities listed in the Annual Funding Agreement and reallocate funds according to the priorities of the Community." The Compact merely authorizes a transfer of authority and contains few substantive limitations on the programs that it governs. Indeed, it does not refer to any specific programs. Those details are left to the 2007–2011 Multi-Year Funding Agreement (MYFA), a contract between the GRIC and the United States "for the assumption of responsibilities by the Community for the various programs, functions, and activities specified in [the MYFA]."

The MYFA lists the programs included within the Compact. The list includes the law enforcement program and its four component parts ("Uniform Police," "Adult Detention," etc.). With few exceptions, the MYFA does not contain any restrictions specific to the law enforcement program. Thus, unlike the 638 Contract's Statement of Work, the MYFA does not supply much detail about the law enforcement program.

C

For our purposes, these agreements are only relevant insofar as the United States can be sued. As a sovereign, the United States is immune from suit unless it waives its immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The United States has waived its sovereign immunity, of course, with regard to tort liability under the Federal Tort Claims Act "under circumstances where the United States, if a private

person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

In 1990, after it enacted the ISDEAA, Congress extended the FTCA's waiver of sovereign immunity to claims "resulting from the performance of functions . . . under a contract, grant agreement, or cooperative agreement authorized by the [ISDEAA] of 1975, as amended." 25 U.S.C. § 450f (note). This provision is commonly referred to as § 314, an allusion to its location within the Act. *See* Department of Interior and Related Agencies Appropriation Act, Pub. L. 101-512, § 314, 104 Stat 1915 (1990). However, the waiver of sovereign immunity is limited:

> [A]n Indian tribe, tribal organization or Indian contractor is deemed hereafter to be part of the Bureau of Indian Affairs . . . while carrying out any such contract or agreement and its employees are deemed employees of the Bureau . . . while acting within the scope of their employment in carrying out the contract or agreement.

*Id.*

The threshold question in this litigation thus becomes whether the actions of the Officers come within the ambit of § 314, thereby subjecting the United States to potential tort liability.

## III

To decide whether the Officers' conduct is covered by § 314, it is first necessary to set out the analysis that courts should undertake when confronted with a § 314 claim, where the alleged tortfeasors are employees of a "tribe, tribal organization, or Indian contractor." *Id.* As no federal appellate court appears to have done so, this case presents a question of first impression.

### A

The clause at issue states that "employees [of a tribe, tribal organization, or Indian contractor] are deemed employees of the Bureau . . . while acting within the scope of their employment in carrying out the contract or agreement." 25 U.S.C. § 450f (note). We immediately notice that the clause is naturally divided into three parts. The first part tells us the subject of the rule announced in the clause: "employees" of a tribe, tribal organization, or Indian contractor. *Id.* The second part contains the action of the sentence, instructing that such employees are "deemed employees of the Bureau." *Id.* Finally, the end of the clause limits the class of employees included within the "deem[ing]" language to those "acting within the scope of their employment in carrying out the contract or agreement."[2] *Id.*

---

[2] We know that "acting within the scope of their employment in carrying out the contract or agreement" is a limitation on the part of the clause that comes before it because of the word "while." In the preceding clause "deem[ing]" an "Indian tribe, tribal organization, or Indian contractor" as "part of the Bureau of Indian Affairs" or the "Indian Health Service," the word "while" introduces the limitation that such tribes, organizations, or contractors must be "carrying out any such contract or agreement" in order to be so "deemed." 25 U.S.C. § 450f (note). The similar structure

The key to understanding the clause, then, is determining whether an employee is "acting within the scope of their employment in carrying out the contract or agreement." *Id.* Only then can we know which class of "employees" are "deemed employees of the Bureau [of Indian Affairs]." *Id.*

1

Federal district courts have jurisdiction over FTCA claims on the basis of 28 U.S.C. § 1346(b)(1). In examining the language of § 1346(b)(1), one is struck by the remarkable similarity between its language and that of § 314. Section 1346(b)(1) states that district courts have jurisdiction over "claims against the United States" for "injury or loss of property, or personal injury or death" caused by the tortious actions of "any employee of the Government while acting within the scope of his office or employment." Section 314's language refers to "employees of the Bureau . . . while acting within the scope of their employment." Both statutes refer to the scope of employment in almost identical language.

A basic principle of interpretation is that courts ought to interpret similar language in the same way, unless context indicates that they should do otherwise. *Cf. Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) (stating that "identical words and phrases within the same statute should normally be given the same meaning"); *see*

---

between the two clauses strongly suggests that the term "while" is used in both to indicate that what follows that term is a limitation on what precedes it. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (stating the "normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning").

*also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (2012). None of the differences between the two phrases suggest that we should treat them differently. Section 1346(b)(1) requires courts to determine whether, under state law, an employee was acting within the scope of employment when the alleged tort occurred. *See, e.g.*, *Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990) (per curiam). Given the similarity between § 1346(b)(1) and § 314, we are satisfied that § 314 requires the same inquiry.

That "scope of employment" is a term of art further supports our interpretation. "It is . . . well established that [w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) (alteration in original) (internal quotation marks omitted); Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."). As the Supreme Court has said in another context, "Congress' intent to incorporate the agency law definition is suggested by [the] use of the term, 'scope of employment,' a widely used term of art in agency law." *Cmty. for Creative Non-Violence*, 490 U.S. at 740. Thus, § 314 requires courts to determine whether, under state law, an employee's allegedly tortious action falls within the scope of his employment.

2

Section 314's limitation extends further: employees must be "carrying out the contract or agreement." 25 U.S.C. § 450f (note). A proper understanding of the statute would give the term "carrying out" its ordinary meaning. *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 225–28 (1994) (consulting dictionaries for the ordinary meaning of a term at the time of a statute's enactment); *see also* Scalia & Garner, *supra*, at 69–77. "To carry out" means "to put into execution" or "to bring to a successful issue." *Merriam-Webster's Collegiate Dictionary* 176 (10th ed. 1993); *see also* 2 *The Oxford English Dictionary* 922 (2d ed. 1989) ("To conduct duly to completion or conclusion; to carry into practice or to logical consequences or inferences."). Thus, to "carr[y] out" a "contract or agreement" is to "to put [it] into execution."

3

It remains for us to describe the relationship between the "scope of employment" requirement and the "carrying out" requirement of § 314. Examining the syntax of the sentence, the "carrying out" language modifies "scope of their employment." This is made clear from the placement of the word "in" between the two requirements. Because "in carrying out the contract or agreement" modifies "scope of their employment," the natural reading of the text is that the relevant "employment" for purposes of determining the scope of employment is "carrying out the contract or agreement." An employee's conduct is covered by the FTCA if, while executing his contractual obligations under the relevant federal contract, his allegedly tortious conduct falls within the

scope of employment as defined by state law.[3] Thus, the federal contract "defines the nature and contours of [an employee's] official responsibilities; but the law of the state in which the tortious act allegedly occurred determines whether the employee was acting within the scope of those responsibilities." *Lyons v. Brown*, 158 F.3d 605, 609 (1st Cir. 1998).

An example illuminates the relationship between the two requirements. Suppose an auto mechanic is employed by an

---

[3] We acknowledge that our interpretation of § 314 makes the scope of employment analysis in § 1346(b)(1) redundant, since satisfying the § 314 test necessarily satisfies the scope of employment test in § 1346(b)(1). One might argue that this violates the canon that "[s]tatutes must be interpreted, if possible, to give each word some operative effect." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997). However, "[n]o canon of interpretation is absolute. Each can be overcome by the strength of differing principles that point in other directions." Scalia & Garner, *supra*, at 59; *see also Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001).

In this context, any potential concerns about superfluity are more than overcome by countervailing interpretive principles. As we have shown, our interpretation is supported by the canon of consistent usage, since the word "while" signals a limiting condition in both of the § 314 clauses that we have discussed. *See supra* note 2. Our interpretation also accords with the canon that common law terms are to be given their common law meaning. *See supra* Part III.A.1; Scalia & Garner, *supra*, at 320–21. Finally, the scope of employment test is part of a conventional FTCA analysis, *see, e.g.*, *CNA v. United States*, 535 F.3d 132, 146 (3d Cir. 2008), and Congress mentioned the test in both § 1346(b)(1) and § 314, stressing its importance. It seems clear, then, that federal courts are to conduct a traditional scope of employment analysis.

Any alternative interpretation of § 314 would violate these and other principles. Accordingly, we are satisfied that our interpretation is the best reading of the statute.

Indian tribe.  In that capacity, the mechanic maintains two flights of vehicles: those used exclusively for carrying out the tribe's contractual obligations under an ISDEAA contract, and those used by the tribe exclusively for non-contractual purposes.  The contract requires the tribe to maintain the ISDEAA vehicles.  One day, the mechanic negligently installs brakes in one of the vehicles, and, shortly thereafter, the vehicle is involved in an accident caused by the faulty brakes.  A person injured by the accident brings suit against the United States under § 314 for the negligence of the mechanic.

In determining whether the mechanic's tort is encompassed by the scope of his employment, a court would need to know what the relevant "employment" was: was the mechanic engaged in his employment under the ISDEAA or in his employment exclusively for the tribe?  The answer might depend on whether the defective vehicle was an ISDEAA vehicle.  The point, however, is that the court could not determine the "scope of employment" for the mechanic without first identifying the relevant "employment" at issue, and because § 314 only covers employment under the federal contracts, such contracts define the "employment" for purposes of the "scope of employment" analysis.

B

These conclusions show that § 314 requires a two-step approach.[4]  Because "[t]he party asserting jurisdiction bears

---

[4] Although no federal appellate court has described the relevant analysis for a § 314 claim, several federal courts have implied that a two-step approach might be appropriate.  *See Hinsley v. Standing Rock Child Protective Servs.*, 516 F.3d 668, 672 (8th Cir. 2008); *Strei v. Blaine*, No.

the burden of establishing subject matter jurisdiction," *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008), a plaintiff in an FTCA suit must identify which contractual provisions the alleged tortfeasor was carrying out at the time of the tort.[5] At the first step of the § 314 inquiry, courts must determine whether the alleged activity is, in fact, encompassed by the relevant federal contract or agreement. The scope of the agreement defines the relevant "employment" for purposes of the scope of employment analysis at step two. Second, courts must decide whether the allegedly tortious action falls within the scope of the tortfeasor's employment under state law. If both of these prongs are met, the employee's actions are covered by the FTCA.

As this two-part test makes clear, however, a plaintiff's failure at either step is sufficient to defeat subject matter jurisdiction. If a court determines that the relevant federal contract does not encompass the activity that the plaintiff ascribes to the employee, or if the agreement covers that conduct, but not with respect to the employee in question, there is no subject matter jurisdiction. Likewise, if a court

---

CIV. 12-1095 JRT/LIB, 2013 WL 6243881, at *5 (D. Minn. Dec. 3, 2013); *Dinger v. United States*, No. 12-4002-EFM, 2013 WL 1001444, at *2 (D. Kan. Mar. 13, 2013); *Garcia v. United States*, No. CIV 08-0295 JB/WDS, 2010 WL 2977611, at *3 (D.N.M. June 15, 2010); *Allender v. Scott*, 379 F. Supp. 2d 1206, 1211 (D. N.M. 2005). Section 314's plain meaning is, therefore, supported by what little precedent exists on the matter.

[5] We need not resolve whether an employee's conduct must be *required* by the contract or may be merely *authorized* by the contract in order for the employee to be "carrying out the contract or agreement." 25 U.S.C. § 450f (note).

decides that the employee's allegedly tortious action does not fall within the scope of employment, the employee's conduct does not come within the FTCA.

When a court determines that there is no subject matter jurisdiction, it may choose to decide the case at either step of the inquiry. If, for instance, an employee drinks at a local bar after work, becomes inebriated, and gets into a bar fight, the employee's actions are almost certainly so far removed from the scope of his employment as to defeat liability for the employer. Thus, a court could decide such a case at step two by stating that there is no plausible argument that the employee's actions fall within the scope of his employment, where such employment is defined as carrying out a federal contract. In this way, the § 314 analysis is similar to a qualified-immunity analysis under 42 U.S.C. § 1983. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). Only where a court decides that an employee's actions are covered by the FTCA under § 314 does the court need to go through both steps of the analysis, since there are some actions that, although not enforcing a contract directly, might come within the terms of § 314 by virtue of state scope-of-employment law.

IV

As a federal court of appeals, we must always be mindful that "we are a court of review, not first view." *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1043 n.4 (9th Cir. 2011) (quoting *Cutter v. Wilkinson*, 544 U.S. 709,

719 n.7 (2005)). Where an argument has been "briefed only cursorily before this Court and [was] not ruled on by the district court," it is normally inappropriate for us to evaluate the argument in the first instance. *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 455 (2d Cir. 2000). This practice is rooted in "our general assumption . . . that we operate more effectively as a reviewing court than as a court of first instance." *Detrich v. Ryan*, 740 F.3d 1237, 1248–49 (9th Cir. 2013) (en banc).

Because this is a case of first impression among federal appellate courts, neither the district court nor the parties conducted their analysis using the framework we have described. As such, we are without the benefit of the district court's analysis of this case using the proper two-step approach. That is particularly significant because of the critical importance of state law to the second step of the § 314 analysis. Although we do not imply that we would reach the second step of the § 314 inquiry, "where both the district court record and the briefing before us is substantially incomplete on [] state law issues" that might be important to our resolution of a case, the proper course of action is to remand to the district court so that it can consider the argument in the first instance with the benefit of full briefing. *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 70 (1st Cir. 2013). Because neither the district court nor any of the parties provided us with an analysis of Arizona scope-of-employment law, we follow our standard practice and remand to the district court.[6]

---

[6] In the district court, the United States conceded that the Officers were acting within the scope of their employment *as tribal police officers*. Defendants' Reply in Support of Motion to Dismiss at 2, *Shirk v. U.S. ex rel. Dep't of Interior*, No. CV-09-1786-PHX-NVW (D. Ariz. August 27, 2010) ("The United States agrees that the officers were acting within the

Even if we wanted to resolve this case at the first step of the § 314 inquiry, we would be wise not to do so on the record before us. That is because of another issue lurking in the background of this appeal: the uncertainty about which contractual obligations were in force between the United States and the GRIC at the time of Shirk's accident. In the district court, neither party disputed that the 2003 Compact incorporated the restrictions of the 638 Contract and its Statement of Work. For that reason, the district court assumed that the 638 Contract's limitations on the authority of tribal officers applied to the 2003 Compact, and the district court's decision was largely based on this assumption. On appeal, however, the GRIC has argued that the 638 Contract expired before the enactment of the 2003 Compact, that the 2003 Compact superseded the terms of the 638 Contract, and that the provisions of the 638 Contract no longer apply. Thus, it is uncertain which contractual provisions govern the actions of the Officers in this case.[7]

---

scope of their employment as Tribal officers, which is determined by Arizona law of respondeat superior, but the issue here is one of statutory application, not common law scope of employment."). The government has not conceded, however, that the Officers were acting within the scope of their employment where the relevant "employment" is "carrying out the contract or agreement." Indeed, the government has always maintained that the Officers were not carrying out the relevant contracts. Thus, the government's concession below does not prevent it from arguing on remand that the Officers were acting outside the scope of their employment for purposes of § 314.

[7] "Generally, we do not consider on appeal an issue raised only by an amicus." *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993). We could, therefore, hold as waived the GRIC's argument concerning the applicability of the 638 Contract's obligations. However, in the past, we have "considered arguments of a jurisdictional nature raised only by amici." *United States v. Gementera*, 379 F.3d 596, 607 (9th Cir. 2004).

The relevance of the 638 Contract is, in part, a factual question, since it is possible that the parties entered into an indefinite, mature version of the contract after three years. *See* 25 U.S.C. § 450j(c)(1)(B); *id.* § 450b(h). We cannot know whether that occurred from the record before us because the district court never made findings on the issue. "[T]he proper recourse for courts of appeals confronted with district court findings of questionable sufficiency is ordinarily to remand for proper first instance factfinding." *Lewis v. Bloomsburg Mills, Inc.*, 773 F.2d 561, 577 (4th Cir. 1985). Such a situation is more likely to occur where, as here, the district court was never presented with an argument for which additional factfinding was relevant. *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 1000 (9th Cir. 2011). Because the district court had no opportunity to analyze whether the 638 Contract provisions applied at the time of Shirk's accident, and because it made no factual findings in that regard, we believe the proper course is to remand. *See Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1282–83 (9th Cir. 2003).

V

We vacate the district court's order dismissing this case for lack of subject matter jurisdiction and remand for further proceedings consistent with this opinion. On remand, and with the benefit of full briefing by the parties, the district court should conduct a new analysis of its subject matter jurisdiction using the two-step framework we have described.

---

Because the applicability of the 638 Contract might affect our analysis at both steps of the § 314 analysis, the GRIC's argument potentially implicates our subject matter jurisdiction, and we exercise our discretion to consider it.

The district court should find whatever facts are necessary to that end.

**VACATED AND REMANDED for proceedings consistent with this opinion.** Each party shall bear its own costs.

SACK, Senior Circuit Judge, concurring:

I am in full agreement with the judgment of the Court. I write only to register my doubts as to one of the district court's conclusions, which the panel's opinion need not and, properly in my view, does not reach in the course of its remand. Were we squarely presented with the issue, I would conclude that the relevant agreements between the federal government and the tribe authorize, indeed perhaps require, the enforcement of Arizona state law by tribal police officers.

The Multi-Year Financing Agreement, as the panel opinion notes, requires the tribe to ensure that all its uniformed officers and criminal investigators maintain state "peace officer certification," and it specifically mentions "AZPOST" certification. MYFA § 2(L). In Arizona, AZPOST certification supplies the necessary *and* sufficient condition for Indian tribal officers engaged in the conduct of their employment to possess the legal powers and duties of state peace officers. *See* Ariz. Rev. Stat. §§ 13-3874(A), 41-1823(B). These powers and duties include the authority to enforce state law and the duty to protect the public order and make arrests. *Id.* §§ 13-3874(A) (providing that certified tribal officers "shall possess *and exercise*" the powers of peace officers (emphasis added)); *id.* § 13-105(25) (defining

"peace officer" as "any person vested by law with a *duty* to maintain public order and make arrests" (emphasis added)). Furthermore, these powers and duties extend outside the officer's home jurisdiction under circumstances that, while limited, would include the tribal officers on the facts of this case. *See id.* § 13-3871(B) (empowering peace officers to enforce the law outside their home jurisdictions in circumstances enumerated in § 13-3883, which include an "actual or suspected violation of any traffic law committed in the officer's presence"); *State v. Nelson*, 208 Ariz. 5, 8-9, 90 P.2d 206, 209-10 (Ct. App. 2004).

In light of this certification regime, I think it apparent that the federal government and the tribe intended that tribal law-enforcement officers possess and exercise the power to enforce state law, both on the reservation and, in some cases, outside of it. The district court, to the contrary, concluded that the reference to peace officer certification is "no more than a training requirement, imposed to ensure than all tribal officers are sufficiently qualified to meet the demands of their positions." *Shirk v. United States*, No. CV-09-1786, 2010 WL 3419757, at *6, 2010 U.S. Dist. LEXIS 89687, at *15 (Aug. 27, 2010).

It is with that proposition that I disagree. AZPOST certification is more than a confirmation that the recipient has been adequately and appropriately trained – it confers specified powers and imposes specified duties on all officers so certified. Inasmuch as the tribe and the government have explicitly referenced AZPOST in their agreement, I cannot but conclude that they intended that officers of the tribe's law enforcement program possess these legally defined powers and duties.

The district court's contrary interpretation was premised on its assumption that the 638 Contract of 1998 sets outer limits of the tribe's duties and authority under the relevant agreements. *See id.* On remand, as the Court's opinion makes clear, the district court should consider whether the 638 Contract even applied at the time of the conduct giving rise to this claim. Panel Op., at 18–20. Even if the 638 Contract did apply, the district court should consider whether the later Compact and funding agreement, by specifically referring to peace-officer certification, effectively amended and expanded the earlier contract with respect to the enforcement of state law.

I think these considerations may have substantial impact on the district court's analysis under the two-step approach established by the Court's opinion today. We cannot decide how this analysis should be conducted, however, without first knowing which of the federal-tribal agreements submitted in this case were in force at the time of the accident, and how these agreements relate to each other. For this reason, I fully concur in the panel's opinion and decision to vacate and remand for further factfinding.

_____

BEA, Circuit Judge, concurring in part, dissenting in part:

This court need not remand. I disagree that "uncertainty about which contractual obligations were in force between the United States and the GRIC at the time of Shirk's accident"

compels remand. Slip op. at 20.[1]  According to the majority, the district court "assumed that the 638 Contract's limitations on the authority of tribal officers applied to the 2003 Compact." Slip op. at 20 (citation omitted). "On appeal, however, the GRIC has argued that the 638 Contract expired before the enactment of the 2003 Compact, that the 2003 Compact superseded the terms of the 638 Contract, and that the provisions of the 638 Contract no longer apply." Slip op. at 20 (citation omitted). All this court need do, however, is to look within the four corners of the contracts in the record: if the 638 Contract contains an expiration provision, it expired pursuant to that provision; if the 2003 Compact contains a provision superseding the 638 Contract, then it supercedes the 638 Contract.[2]  There are no issues of fact that

---

[1] The majority accurately summarizes the facts and the legal issues relevant to this case. I adopt them here. In short: plaintiffs' FTCA claim survives FRCP 12(b)(1) dismissal if the actions of the GRIC officers fall under the scope of the FTCA's waiver of sovereign immunity. "Section 314" extended the FTCA's waiver of sovereign immunity to claims "resulting from the performance of functions . . . under . . . [certain] contract[s], grant agreement[s], or cooperative agreement[s] . . . ." Slip op at. 8 (citations and internal quotations omitted). Here, GRIC entered into certain contracts that allowed them some autonomy over various tribal law enforcement responsibilities. Slip op. at 6–10. Therefore, the plaintiffs' FTCA claim falls under the FTCA's waiver of sovereign immunity if the GRIC officers were carrying out the obligations of the operative agreement between GRIC and the United States. There are two possible operative agreements: (1) the "638 Contract," slip op. at 8, and (2) the "2003 Compact," slip op. at 9.

[2] Furthermore, "[a] question of fact concerning the interpretation of a contract does not arise unless the contract is ambiguous." *Barona Group of Capitan Grande Band of Mission Indians v. American Mgmt. & Amusement, Inc.*, 840 F.2d 1394, 1401 (9th Cir. 1987) (citation omitted). No party has claimed there were ambiguities in the contracts before the court here.

require remand.  Therefore, even though the district court did not employ the new two-part test we hand down today, and "[t]ypically, a federal appellate court does not consider an issue not passed upon below," *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094 (9th Cir. 2014) (internal quotations and citation omitted), we have the "discretion to decide whether to reach such an issue . . . where the issue presented is a purely legal one and the record below has been fully developed," *id.* at 1094–95 (citation omitted).

The district courts of this circuit would have benefitted from a precedential opinion that applied the new two-part test.  The majority opinion has sidestepped this opportunity. I do not see much point to writing a non-precedential, one-judge analysis of the merits.  Therefore, I agree with the new two-part test articulated here, but I would not remand. I respectfully concur in part, and dissent in part.