*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TOM DONOVAN NICOLOS, | ) | |
| | ) | Supreme Court No. S-16428 |
| Appellant, | ) | |
| | ) | Superior Court No. 2BA-15-00178 CI |
| v. | ) | |
| | ) | O P I N I O N |
| NORTH SLOPE BOROUGH, | ) | |
| | ) | No. 7257 – July 13, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Barrow, Angela Greene, Judge.

Appearances: Timothy Seaver, Seaver & Wagner, LLC, Anchorage, for Appellant. Danielle M. Ryman and Jared L. Gardner, Perkins Coie LLP, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I.     INTRODUCTION

The North Slope Borough discharged employee Tom Donovan Nicolos after he made statements that Borough employees interpreted as threats. Nicolos appeals from the superior court's order approving the Borough Personnel Board's decision affirming his discharge. He claims that his statements did not constitute threats or other

misconduct under the Borough's personnel rules and that the Borough failed to conduct an adequate investigation into his alleged misconduct before terminating him. Nicolos also claims that his purportedly threatening statements were manifestations of a disability and that his discharge violated the Americans with Disabilities Act[1] (ADA) and the Alaska Human Rights Act[2] (AHRA). We reject Nicolos's claims of error and affirm the judgment of the superior court approving the Personnel Board's decision.

## II.    FACTS AND PROCEEDINGS

### A.    The First Alleged Threat

Nicolos began working in Utqiagvik (then called Barrow) for the North Slope Borough Department of Public Works in 2013. At some point Nicolos began having thoughts of harming himself and harming others — thoughts that Nicolos would later characterize as "unwelcome." The thoughts persisted, and one day in January 2015 he "woke up feeling the worst that [he] had."

Following advice from his parents, Nicolos went to work and immediately sought out his supervisor, Brittney Toalston, to inform her about his unwelcome thoughts of harm. Meeting in their shared office, Nicolos told Toalston that he "was not in a good place, . . . d[id] not want to hurt others, . . . did not want to hurt [him]self, and . . . did not want to go to jail." Toalston later testified to the Personnel Board that during this conversation Nicolos was "[v]ery agitated, stressed, and really red in the face" — "like he was very fidgety and he had to do something."

Toalston knew from previous conversations with Nicolos that he "ha[d] access to firearms and weapons." As a result, Toalston "became very scared for [her]self and [her] employees." She moreover did not "know how [she and the other employees]

---

[1]    42 U.S.C. §§ 12101-12213 (2012).

[2]    AS 18.80.010-.300.

were going to act or work with somebody who said something like that." She advised Nicolos to clock out and seek treatment, and she sent her two other subordinates home for the day. She later testified, "[I]f I didn't feel safe in my workplace, then I feel my employees shouldn't be at work either."

### B.     The Second Alleged Threat

Nicolos left the workplace, as instructed by Toalston, but was unable to obtain immediate treatment in Utqiagvik. He flew to Anchorage that evening, and the next day he had a counseling session at Providence Alaska Medical Center with Mandie Webb, LPC.

After she met with Nicolos, Webb contacted Toalston and two Department employees that day to warn them about Nicolos's "homicidal ideation." The nature of Nicolos's comments to Webb and the content of Webb's disclosure to Toalston and the others are disputed. According to Toalston, Webb told her Nicolos "had expressed . . . that he had a list of people that he wanted to hurt either with guns or weapons," that Toalston "was number one on his list," and that "next was [Department employee] Ekatarina Pili and then [former Department employee] Pam Amling." Pili, one of the two other individuals warned by Webb, corroborated Toalston's account. She testified, "[Webb] told us pretty much that . . . [Nicolos] had either planned or premeditated to come to the workplace and open fire."

Amling, who also received a warning from Webb, gave a different account. She testified that she "d[id] not remember [Webb] saying anything about a plan to kill anybody" and that instead Webb had informed her that Nicolos had been "having feelings of hurting himself and such." For his part, Nicolos testified that he did not tell Webb he had a *plan* to kill his supervisor or anyone else. Rather, he told Webb he had been having *thoughts* — "unwelcome" thoughts — of harming his supervisor. Further he did not know when he made his comments to Webb that she would disclose them to

Toalston.  Webb did not testify at the Personnel Board hearing.  But her notes, introduced at that hearing, state that she "contacted [Nicolos's] supervisor, . . . Toalston . . . , [about] the homicidal statements made by [Nicolos]."  The notes do not mention a hit list or premeditated plan to kill.

### C.    The Borough's Response To The Alleged Threats

Toalston later testified at the Personnel Board hearing that after receiving the call from Webb about Nicolos's homicidal ideation, she cried and was "in shock." Toalston also testified that she "became sick to [her] stomach" and vomited.  Similarly, Pili testified that she was "really kind of distraught and shocked" after receiving Webb's call.  She thought there was "a high possibility that [Nicolos] could come to work and do whatever . . . [Webb] had said."

On January 14, the same day Webb contacted her, Toalston sent an email to the Borough's human resources and legal departments, her supervisor, and the Director of Public Works summarizing her conversation with Webb.  The email stated that Webb had said "she ha[d] a legal obligation to reach out to each of [the warning recipients] to let [them] know that [Nicolos] ha[d] planned and ha[d] wanted to use firearms on all three [employees] in the office."  The email further stated:

> [Pili] and I will both submit restraining orders on [Nicolos] for fear of our lives.
>
> Please — please let me know if there is anything else we can do.  Because right now you have two women ([Pili] and myself) tearing up with the fact that [Nicolos] has a possibility of coming back to our office . . . .

Toalston later did obtain a protective order against Nicolos.[3]

---

[3]    The superior court subsequently vacated this order, apparently on the ground that it was not supported by sufficient competent evidence.  But the vacatur

(continued...)

Price Leavitt, a deputy director in the Department and Toalston's supervisor, testified that the Department held an "emergency meeting" to decide how to deal with Nicolos's statements to Toalston and Webb. Leavitt testified that following this meeting, the Department "put security measures into the [Department's] building by putting in special glass around the reception area . . . [and] security cameras" and by employing a security guard.

The Department placed Nicolos on investigative leave on January 16. Leavitt was responsible for investigating Nicolos's alleged misconduct. In conducting this investigation, Leavitt talked to Toalston twice, reviewed the Borough's personnel rules, and consulted with the Borough's human resources and legal departments. He did not interview Nicolos or other witnesses.

After he completed his investigation, Leavitt sent Nicolos a "notice of contemplated discharge" on January 29. The notice informed Nicolos of the allegations against him, of the personnel rules that he was alleged to have violated, and that the Borough was contemplating discharging him. Further, the notice informed Nicolos that he would have "an opportunity to present any evidence or otherwise respond" at a meeting with Leavitt on February 9. Nicolos submitted a written response, and he attended the February 9 meeting telephonically. Following this meeting, the matter of Nicolos's discipline was delegated to another deputy director in the Department, who decided to proceed with Nicolos's termination. This deputy director sent a second notice of contemplated discharge on February 17.

In accordance with the second notice, a predisciplinary hearing was held on February 26 before the Department Director. At the hearing, Nicolos testified under

---

**3** (...continued)
occurred after the Borough discharged Nicolos and after the Personnel Board rendered its decision.

oath and presented other evidence, including Webb's notes. Nicolos testified that he had not intended to threaten anybody and that "[h]aving a feeling, an idea or an emotion is not in fact a threat or threatening." He further explained that his homicidal thoughts had been caused by a traumatic brain injury in his youth, that he was being treated for the injury, and that he no longer experienced the thoughts.

Following the hearing, on March 2, the Borough terminated Nicolos. The notice of discharge from the Director stated that the basis for the discharge was Nicolos's statements to Webb about his homicidal thoughts. The Director determined that these statements "violat[ed] . . . the Personnel Rules and Regulations on violence in the workplace and m[et] the definition of a 'threat.' "

### D.    The Personnel Board's Hearing And Decision

Nicolos appealed his termination to the Borough Personnel Board. In June 2015 the Board held a two-day hearing. In addition to the evidence summarized above, Nicolos and Amling testified that Toalston had been a verbally abusive supervisor. Toalston, however, denied mistreating Nicolos. Nicolos also offered the testimony of his psychiatrist, who explained that Nicolos was no longer homicidal and that he posed no danger. The psychiatrist testified that there is a "huge difference" between thoughts and planning, and she asserted that "at no point in the documentation did [she] find any . . . evidence that [Nicolos] was having intention of acting on [his homicidal] thoughts."

The Board concluded that just cause existed to discharge Nicolos. The Board found that Nicolos's statements to Toalston about not being in a good place and not wanting to hurt anyone "constituted an indirect threat, as the . . . statements could be interpreted by a reasonable person as implying that [Nicolos] ha[d] intent to cause physical harm." Further, the Board found that Nicolos's statement to Webb about a "premeditated plan to use firearms to harm or kill" his coworkers was a "direct threat."

The Board thus determined that Nicolos had violated the Borough's personnel rules prohibiting violence and threats in the workplace, as well as its personnel rule requiring employees to "work effectively, amenably and courteously" with their coworkers.

The Board also determined that Nicolos's termination did not violate the ADA or the AHRA. The Board assumed that Nicolos was disabled and that Nicolos's purported threats were a manifestation of this disability. But the Board found that there was "no evidence that [Nicolos] was terminated because of his disability." It found that Nicolos "cannot be considered 'otherwise qualified' to perform the essential duties of his job, because threats of violence violated the Borough's policy against violence in the workplace." The Board further found that "there was no reasonable accommodation that could be made for [Nicolos], as his co-workers would always be in fear for their safety due to [Nicolos's] threats."

### E.    The Superior Court's Decision

Nicolos filed an appeal in the superior court. The court reversed the Board's findings that Nicolos's statements to Toalston and Webb constituted threats that violated the personnel rule against violence in the workplace. It reasoned that the rule "require[d] an employee to have intended to make a threat" and that "[n]o reasonable person [could] find that Nicolos intended to threaten anyone when he sought help for his mental health issues." The court approved, though, the Board's conclusion that Nicolos's statements violated the personnel rule requiring Nicolos to work effectively, amenably, and courteously. The court affirmed Nicolos's termination.[4]

---

[4]    As explained below, we affirm the superior court's approval of the Board's decision. We disagree, however, with the superior court's ruling that Nicolos's statements did not constitute threats under the personnel rules. *See infra* Part IV.B.1. Moreover, we do not address the superior court's ruling that Nicolos violated the personnel rule requiring him to work effectively, amenably, and courteously with his

## III. STANDARD OF REVIEW

In this appeal from the Borough Personnel Board — an administrative agency[5] — we "independently review" the Board's decision without giving deference to the superior court's intermediate review.[6] We accept the Board's findings of fact so long as they are supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7]

With respect to questions of law, we apply either the "reasonable basis test" or the "substitution of judgment standard."[8] The reasonable basis test applies when reviewing "questions of law involving 'agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions.' "[9] Under this test, we seek only "to determine whether the agency's decision is supported by the facts and has a reasonable basis in law, even if we may not agree with the agency's ultimate determination."[10] The substitution of judgment standard, in contrast, applies "to

---

[4] (...continued)
coworkers.

[5] *See Keiner v. City of Anchorage*, 378 P.2d 406, 410 (Alaska 1963).

[6] *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 72 (Alaska 2013).

[7] *Brown v. Pers. Bd. for Kenai*, 327 P.3d 871, 874 (Alaska 2014) (quoting *Grimmett v. Univ. of Alaska*, 303 P.3d 482, 487 (Alaska 2013)).

[8] *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014).

[9] *Id.* (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

[10] *Id.* (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

questions of law where no agency expertise is involved."[11] Under this standard, "we may 'substitute [our] own judgment for that of the agency even if the agency's decision had a reasonable basis in law.' "[12]

## IV. DISCUSSION

Nicolos claims that the Personnel Board erroneously determined he made threatening comments and violated the Borough personnel rules, that the Borough failed to conduct an adequate investigation before deciding to discharge him, and that the Borough violated the ADA and the AHRA by discharging him based on conduct arising from his disability. Before proceeding to the first of these contentions, we resolve a threshold matter.

### A. The Borough Was Not Required To File A Cross-Appeal.

Nicolos asserts that we must accept the superior court's ruling reversing the Personnel Board's determination that Nicolos's statements to Toalston and Webb constituted threats because the Borough failed to cross-appeal this ruling. But Nicolos misunderstands the cross-appeal requirement. "[A]n appellee may urge . . . in defense of a decree or judgment any matter appearing in the record, even if rejected below and even if [the] appellee's argument may involve an attack upon the reasoning of the lower court or an insistence upon [a] matter overlooked or ignored by it."[13] It is only when an appellee "attack[s] [a] decree [or judgment] with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary" that the appellee must file a cross-

---

[11]    *Id.*

[12]    *Id.* (alteration in original) (quoting *Tesoro Alaska*, 746 P.2d at 903).

[13]    *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961).

appeal.[14] We are not bound by the superior court's ruling on Nicolos's threats, because our reversal of that ruling (in the following section) serves only to provide a basis for affirming the superior court's ultimate judgment approving the Board's decision. Reversal of the ruling does not alter the rights of the parties under the superior court's judgment or the Board's decision.

**B.     The Personnel Board Did Not Err In Finding That Nicolos Violated Personnel Rules Prohibiting Workplace Violence.**

We turn now to Nicolos's claim that the Personnel Board erred in determining that his statements to his supervisor and to the counselor were threats or workplace violence under the Borough's personnel rules. Nicolos urges us to interpret the personnel rules as allowing discipline only for "misconduct," attacks the Board's factual findings, and argues that the Board's application of the rules under the circumstances of this case discourages employees experiencing violent thoughts from seeking treatment.

**1.     An employee need not engage in culpable behavior to violate the Borough's personnel rules prohibiting workplace violence.**

The superior court ruled that an employee cannot commit a punishable threat under the Borough's personnel rules unless the employee "intend[s] to make a threat." Nicolos does not defend this ruling, but he argues that an employee does not commit a punishable threat under the personnel rules unless the employee's behavior constitutes "misconduct."

---

[14]     *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)); *see, e.g.*, *Peterson v. Ek*, 93 P.3d 458, 467 (Alaska 2004) (declining to address appellee's arguments concerning damages awarded to appellant); *Jackson v. Nangle*, 677 P.2d 242, 247 n.3 (Alaska 1984) (declining to address appellee's argument relating to an offset of damages); *Alaska Brick Co. v. McCoy*, 400 P.2d 454, 457 (Alaska 1965) (declining to address appellee's argument that his attorney's fees award should be increased).

Two personnel rules, cited by the Personnel Board in its decision and by the Director of Public Works in the notice of discharge, apply here. First, North Slope Borough Personnel Rules and Regulations § 3.03.1 provides:

> VIOLENCE IN THE WORKPLACE PROHIBITED. Threatening or intimidating behavior and violence in the workplace are unacceptable conduct and will not be tolerated in the North Slope Borough.

And second, North Slope Borough Personnel Rules and Regulations § 3.03.2 states, in relevant part:

> VIOLENCE IN THE WORKPLACE DEFINED. An action (verbal, written or physical aggression) that is intended to control another, or that is intended to cause, or is capable of causing, death or other serious bodily injury to oneself or others, or damage to property. Workplace violence includes abuse of authority, intimidating or harassing behavior or threats. Actions include but are not limited to:
>
> . . . .
>
> (F) Threat. Any oral or written expression or gesture that could be interpreted by a reasonable person as conveying intent to cause physical harm to persons or property.

The proper interpretation of these rules presents a question of law.[15] Nicolos and the Borough disagree over which standard applies to this question; Nicolos argues that we should substitute our judgment for that of the Board in its interpretation of the rules, while the Borough claims that we should apply the reasonable basis standard because the Board has expertise in interpreting and applying the Borough's personnel rules. However, we decline to resolve this dispute because our conclusion would be the same

---

[15] *See Palmer v. Municipality of Anchorage, Police & Fire Ret. Bd.*, 65 P.3d 832, 837 (Alaska 2003) (indicating that interpretation of a municipal regulation presents a question of law); *see also North Slope Borough v. Bray*, No. S-6115, 1995 WL 17803841, at *1 & n.3 (Alaska Jan. 25, 1995).

under either standard of review. We accordingly apply the substitution of judgment standard and will "adopt the rule of law 'most persuasive in light of precedent, reason, and policy.' "[16]

We disagree with the superior court's interpretation of these rules as only prohibiting intentional threats. It appears that under § 3.03.2 an employee must have some level of intent or capacity to cause harm in order to commit "violence in the workplace." But § 3.03.1 prohibits not only "violence in the workplace," but also "[t]hreatening or intimidating behavior." The rules do not state that an employee must have a culpable mental state to engage in threatening or intimidating behavior under § 3.03.1. Moreover, in construing § 3.03.1's prohibition against threatening or intimidating behavior, we look to § 3.03.2(F).[17] This provision defines "threat" in objective terms: the question is whether an employee's expression or behavior "could be interpreted by a reasonable person as conveying intent to cause physical harm," not whether the employee actually intended to cause physical harm or to convey a desire to cause such harm.

We also reject Nicolos's argument that only "misconduct" can qualify as a punishable threat. Nicolos does not explain what he means by "misconduct," but he

---

[16] *State v. Schmidt*, 323 P.3d 647, 655 (Alaska 2014) (quoting *State v. Anthony*, 810 P.2d 155, 157 (Alaska 1991)).

[17] *See Shirk v. United States*, 773 F.3d 999, 1004 (9th Cir. 2014) ("A basic principle of interpretation is that courts ought to interpret similar language in the same way, unless context indicates that they should do otherwise."); *see also Basey v. State, Dep't of Pub. Safety, Div. of Alaska State Troopers, Bureau of Investigations*, 408 P.3d 1173, 1177 (Alaska 2017) ("Generally, 'each part . . . of a statute should be construed with every other part . . . so as to produce a harmonious whole.' " (omissions in original) (quoting *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 99 (Alaska 2012))).

seems to mean that the conduct must be culpable or blameworthy in some way.[18] There is no textual basis in the personnel rules for such a requirement. And we agree with the Borough that a focus on the culpability of an employee's actions as opposed to the consequences of those actions would undermine the workplace violence "policy's function of preserving a safe work environment."

Therefore, we conclude that under the Borough's personnel rules an employee can be punished for his threatening statement or behavior so long as it could be interpreted by a reasonable person as conveying intent to cause physical harm.

### 2. The Board's determinations that Nicolos's statements constituted punishable threats are supported by substantial evidence.

Nicolos argues that the Board erred when it determined he made threatening statements to his supervisor, Toalston, and to the counselor, Webb, in violation of the Borough's personnel rules. In evaluating Nicolos's argument, we must accept the Board's findings of fact concerning what Nicolos said to Toalston and to Webb as long as they are supported by substantial evidence. The same is true of the Board's determinations that Nicolos's statements could be interpreted by a reasonable person as conveying intent to cause harm: these are factual findings subject only to substantial evidence review.[19]

---

[18]     In this regard, Nicolos contends that he "did . . . not engage in any 'misconduct' " and in fact "did exactly what his employer and any reasonable person would want him to do — he sought treatment for his 'unwelcome' thoughts and he engaged in that treatment openly and honestly." The Board in fact "commend[ed] [Nicolos] for seeking professional medical assistance," and the Borough concedes in its brief that Nicolos's "effort to be 'open and honest' with Webb was [not] anything but proper."

[19]     *Cf. Becker v. Fred Meyer Stores, Inc.*, 335 P.3d 1110, 1116 (Alaska 2014) (continued...)

The Board found that Nicolos told Toalston "that he was 'not in a good place' and that he did not want to hurt himself or others . . . [or] go to jail." The Board determined that these statements were an "indirect threat" as they "could be interpreted by a reasonable person as implying that [Nicolos] ha[d] intent to cause physical harm." The Board also found that Nicolos told Webb that he had "a premeditated plan to use firearms to harm or kill people at his workplace." It found that this statement "could be interpreted by a reasonable person as conveying intent to cause physical harm" and thus constituted a "direct threat to use violence in the workplace."

The Board's findings are supported by substantial evidence. With regard to the first incident, both Nicolos and Toalston testified that Nicolos said he was not in a good place, did not want to hurt himself or others, and did not want to go to jail. Toalston further testified that Nicolos was "[v]ery agitated," "red in the face," and "fidgety" when he made these statements. Nicolos testified that he did not mean to put Toalston in fear. But given the statements' unusual nature and Nicolos's highly agitated demeanor when making them, the Board did not err in finding that a reasonable person could have interpreted the statements as conveying an intent to cause physical harm.

With regard to the second incident, Toalston testified that Webb told her that Nicolos said he had a list of people he wanted to harm with guns or other weapons; Pili (Nicolos's coworker) testified that Webb told her that Nicolos had a premeditated plan "to come to the workplace and open fire." Furthermore, as the Board noted in its

---

[19]     (...continued)
(holding that the question "whether a reasonable person would believe that the provisions of [an employment manual] are binding" was, under the circumstances, a factual question for the jury); *Braham v. Fuller*, 728 P.2d 641, 644 (Alaska 1986) ("Whether particular conduct is reasonable under the circumstances is generally considered a question of fact . . . ." (quoting *Carlson v. State*, 598 P.2d 969, 974 (Alaska 1979))).

decision, Webb, a licensed professional counselor, was permitted to reveal Nicolos's confidential statements only if she determined there was "a clear and immediate probability of physical harm to [Nicolos], other individuals, or society."[20] And Webb was allowed to make such a disclosure only to "a potential victim, the family of a potential victim, law enforcement authorities, or other appropriate authorities."[21] Webb's apparent belief — evidenced by her disclosures — that Nicolos posed a clear and immediate probability of harm and that Toalston and Pili were potential victims corroborates Toalston's and Pili's testimony about Webb's disclosure.[22]

On appeal Nicolos attacks Toalston's credibility. He notes that some of her testimony was contradicted by other evidence in the hearing record (for example, Amling's testimony and Webb's notes), and he points to evidence that purportedly shows Toalston was an abusive supervisor with an animus towards him. But we do not " 'reweigh conflicting evidence, determine witness credibility, or evaluate competing inferences from testimony,' as these functions are reserved to the agency."[23] Significantly, Nicolos does not address the fact that Toalston's testimony was

---

[20] AS 08.29.200(a)(1). There are other statutory grounds for disclosure, but none apply in this case. AS 08.29.200.

[21] AS 08.29.200(a)(1).

[22] Moreover, the Board's task was to determine whether there was "just cause" to support the Department's discipline decision. North Slope Borough Code (NSBC) 2.20.180(c) (2017). Although the Board ultimately found that Nicolos told Webb he had a premeditated plan to kill, the Board really only needed to find that the Department "reasonably believed" that Nicolos had such a plan. *Cassel v. State, Dep't of Admin.*, 14 P.3d 278, 284 (Alaska 2000) (quoting *Braun v. Alaska Commercial Fishing & Agric. Bank*, 816 P.2d 140, 142 (Alaska 1991)). The corroborated testimony of Webb and Pili is more than sufficient to support the latter finding.

[23] *McKitrick v. State, Pub. Emps. Ret. Sys.*, 284 P.3d 832, 837 (Alaska 2012) (quoting *Lindhag v. State, Dep't of Nat. Res.*, 123 P.3d 948, 952 (Alaska 2005)).

corroborated by Pili's; and as explained above, both Toalston's and Pili's testimony was corroborated by Webb's apparent determination that Nicolos's statements warranted breaching confidentiality.

Nicolos points out that Toalston's and Pili's testimony about Webb's disclosure was hearsay. But the Board was permitted to consider hearsay under the procedural rules governing its hearings.[24] The hearsay was not "inherently unreliable," as Toalston's and Pili's testimony was mutually corroborating and was also corroborated by Webb's decision to breach confidentiality and Toalston's contemporaneous email to Borough employees.[25] And the hearsay did not "jeopardize[] the fairness of the proceeding[],"[26] because Nicolos had an opportunity at the predischarge hearing and at the hearing before the Board to present his account of what he said to Webb. There is moreover no indication that Nicolos was prohibited from calling Webb as a witness or offering her affidavit.

Nicolos's statement to Webb — as found by the Board — that he had a premeditated plan to kill his supervisor, coworker, and others was on its face a statement of intent to cause physical harm. A reasonable person could have interpreted such a statement literally even though it was made during the course of a counseling session. Indeed, both Toalston's and Pili's testimony indicates that they interpreted Nicolos's

---

[24] *See* NSBC 2.20.180(F) (2017) ("The formal rules of evidence are not applicable [in hearings before the Board].").

[25] *Button v. Haines Borough*, 208 P.3d 194, 201 (Alaska 2009) ("[W]e will not reverse an administrative judgment based on hearsay unless the hearsay was inherently unreliable or jeopardized the fairness of the proceedings.").

[26] *Id.*

statement literally.[27] Both testified that they were frightened by Webb's disclosure; Toalston testified she became so nervous that she became ill.

The Department and the district court also both took Nicolos's statement seriously. The Department put security measures in place, and the district court issued a protective order to Toalston. The nature of Nicolos's statement and the reactions of these individuals and entities to the statement support a finding that a reasonable person could interpret the statement as conveying intent to harm. The Board did not err in finding that this statement was a punishable threat.[28]

### 3. Public policy concerns do not override the personnel rules.

Nicolos argues that he made his statements to Toalston and Webb in the course of seeking treatment for his unwanted homicidal thoughts and that the Borough's decision to punish his help-seeking behavior by terminating him "has alarming implications." In particular, he contends that "[i]n a state and a region that continue[] to suffer from a near epidemic of self-harm, adopting a policy that discourages people from seeking treatment is both dangerous and cruel." And he further contends that the Borough's actions in this case may have the effect of discouraging healthcare providers

---

[27] As Toalston and Pili are "presumably reasonable" persons, their subjective reactions to Nicolos's statements provide some evidence of how an objectively reasonable person could understand Nicolos's statements. *Munson v. State*, 123 P.3d 1042, 1053 n.58 (Alaska 2005).

[28] Nicolos does not raise the issue whether his conduct amounted to a "serious infraction[]" warranting discharge. *See* NSBC 2.20.178(D) (2017) ("Discharge from Borough employment is the appropriate level of discipline to be imposed by the department director for serious infractions or continued unwillingness or inability to correct unacceptable actions or performance."). We therefore decline to address the issue. *See State v. Ranstead*, ___ P.3d ___, Op. No. 7234 at 13 n.53, 2018 WL 1660862, at *6 n.53 (Alaska Apr. 6, 2018) ("Appellate courts typically do not address issues that the parties have not briefed.").

from giving warnings such as the one Webb gave in this case: "[n]o competent or ethical health care provider would choose to get their patient fired . . . [during] a mental health crisis."

As the Borough points out, however, it has a strong interest in maintaining a workplace free of violence and threats of violence. And Nicolos has not cited any authority that would justify substituting our policy judgment for that of the Borough's Mayor and Assembly, which approved the personnel rules at issue in this case.[29] We therefore reject Nicolos's policy argument.

## C. Any Deficiencies In The Borough's Investigation Were Harmless.

North Slope Borough Personnel Rules and Regulations § 4.01.3(A) states:

> In response to any evidence or allegation(s) of wrongdoing by an employee . . . , the supervisor or other designated person shall first conduct a thorough investigation of the facts and circumstances of the allegation(s) to determine if disciplinary action should be contemplated. The results of the investigation shall be recorded with the report and all relevant evidence retained . . . .

Nicolos claims that the Borough failed to comply with this requirement and requests that we remand for a proper investigation.[30] He notes that Leavitt, the deputy director

---

[29] *See* NSBC 2.20.140(A) (2017) ("The Human Resources Director shall prepare and submit to the Mayor any proposed amendments to the personnel rules . . . for his review, amendment, approval or rejection. (Any amendment or approval is subject to Assembly review)."); *cf. Municipality of Anchorage v. Leigh*, 823 P.2d 1241, 1244 (Alaska 1992) ("[A] court is not empowered to substitute its judgment for that of the [legislative body] on matters of policy, nor to strike down a statute which is not manifestly unconstitutional even though the court may consider it unwise." (quoting 1 NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 2.01, at 15-16 (4th ed. 1985))).

[30] The Board did not make any findings or conclusions about the quality of
(continued...)

responsible for the investigation, did not interview him before sending the first notice of contemplated discharge and in fact spoke to only one witness with personal knowledge of any of the events at issue: Toalston. Nicolos also notes that Leavitt did not document his investigation in a written report, as required by § 4.01.3(A).

We need not decide whether Leavitt's investigation was inadequate, because even assuming it was, any inadequacies were remedied by subsequent administrative procedures.[31] After the Borough sent its first notice of contemplated discharge to Nicolos, Nicolos met with Leavitt telephonically and submitted a written response. And after the Borough sent the second notice of contemplated discharge, Nicolos attended a predisciplinary hearing at which he was able to testify under oath and present evidence. Following his discharge, Nicolos had the opportunity to appeal to the Board where he presented evidence and cross-examined the Borough's witnesses. Nicolos thus had a full opportunity to present his side of the story, and the relevant decision makers in the Borough (first the Director of the Department and later the Board) had an adequate record on which to base their decisions.

Nicolos contends that "to argue that a subsequent hearing remedies the failure to conduct an investigation would necessarily render the investigative requirement meaningless." But the issue here is not whether the Borough followed its investigation

---

[30]    (...continued)
the Borough's investigation into Nicolos's misconduct, even though Nicolos raised the issue. The superior court found that the Borough's "investigation of Nicolos did not perfectly follow its regulations," but concluded — as we do, *infra* — "that this error was harmless."

[31]    *See Kalmakoff v. State, Commercial Fisheries Entry Comm'n*, 693 P.2d 844, 849 (Alaska 1985) ("Not all errors . . . require reversal. We have employed a 'harmless error' standard in reviewing administrative determinations."); *see also Brandon v. State, Dep't of Corr.*, 73 P.3d 1230, 1236 (Alaska 2003); *Municipality of Anchorage v. Carter*, 818 P.2d 661, 666 n.13 (Alaska 1991).

requirements; rather, the issue is whether Nicolos was deprived of a full and fair opportunity to be heard — that is, whether he was prejudiced. Nicolos argues that he was prejudiced by the deficient investigation because "once the Borough got to the point of 'contemplating' [his] discharge the matter had already become adversarial, with the Borough management on one side and [Nicolos] on the other." But this theoretical point does not warrant reversal absent any concrete indication of prejudice.

### D. Nicolos's Discharge Did Not Violate The ADA Or The AHRA.

Nicolos's final claim is that the Borough violated the ADA and the AHRA because it terminated him on the basis of conduct — his purportedly threatening statements — that arose from his mental disability. Since the Board lacks special expertise concerning the ADA and the AHRA, we apply the substitution of judgment standard in construing these statutes. We thus "adopt the rule of law 'most persuasive in light of precedent, reason, and policy.' "[32] Also, Nicolos's ADA and AHRA arguments run together — he does not distinguish between the two statutes — and so we do not here address the possibility that the AHRA may provide broader protections to disabled employees than does the ADA.[33]

---

[32] *State v. Schmidt*, 323 P.3d 647, 655 (Alaska 2014) (quoting *State v. Anthony*, 810 P.2d 155, 157 (Alaska 1991)).

[33] *See Gilbert v. Sperbeck*, 126 P.3d 1057, 1062 (Alaska 2005) (holding AHRA claim waived where initial brief mentioned only ADA and reply brief made only "terse and superficial" AHRA argument). Nicolos perfunctorily notes that we have said the AHRA "is intended to be more broadly interpreted than federal law to further the goal of eradication of discrimination." *Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 842 (Alaska 2010) (quoting *VECO, Inc. v. Rosebrock*, 970 P.2d 906, 912 (Alaska 1999)). But he does not elaborate or explain how this principle should apply in this case.

1. **The ADA and the AHRA do not preclude an employer from discharging an employee who is unable to perform the essential functions of his or her position due to the employee's violations of the employer's workplace violence policies.**

"Congress enacted the ADA in order to eliminate discrimination against individuals with disabilities,"[34] and the Alaska legislature enacted the AHRA to, among other things, "encourage and enable physically and mentally disabled persons to participate fully in the social and economic life of the state and to engage in remunerative employment."[35] Both statutes expressly prohibit employers from discriminating against employees on the basis of disability.[36]

The statutes' protections do not, however, extend to an employee who is terminated because he cannot "perform the essential functions of [his] position . . . (with or without reasonable accommodation)."[37] And an employee who violates the

---

[34] *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1160 (9th Cir. 2011).

[35] AS 18.80.200(b).

[36] 42 U.S.C. § 12112(a) (2012) ("No covered [employer] shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."); AS 18.80.220(a)(1) ("[I]t is unlawful for . . . an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's . . . physical or mental disability . . . when the reasonable demands of the position do not require distinction on the basis of . . . physical or mental disability . . . .").

[37] *Smith*, 240 P.3d at 843 (quoting *Moody-Herrera v. State, Dep't of Nat. Res.*, 967 P.2d 79, 88 (Alaska 1998)); *see* 42 U.S.C. § 12112(a) (only protecting "qualified individual[s]"); AS 18.80.220(a)(1) (prohibiting disability discrimination only "when the reasonable demands of the position do not require distinction on the basis of . . . physical (continued...)

employer's workplace violence policy — whether due to his disability or due to some other factor — will generally be considered unable to perform the essential functions of his position.[38] This is because "[i]t is an essential function of a job . . . [to] be able to handle stressful situations . . . without making others in the workplace feel threatened for their own safety."[39] Thus, an employee's violation of a workplace violence policy may

---

[37]    (...continued)
or mental disability").

[38]    *See* EQUAL EMP'T OPPORTUNITY COMM'N, NO. 915.002, ENFORCEMENT GUIDANCE ON THE AMERICANS WITH DISABILITIES ACT AND PSYCHIATRIC DISABILITIES, 1997 WL 34622315, at *16 (1997) (explaining that an employee who has threatened a supervisor "is no longer a qualified individual with a disability"). The EEOC's non-regulatory guidance is not binding on us, *O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002), but we find it persuasive. Some courts, contrary to the EEOC, have held that workplace violence does not render a disabled employee unqualified. But those courts have nonetheless held that violence furnishes a nondiscriminatory basis for firing the qualified, disabled employee. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 172-73 (2d Cir. 2006); *Wills v. Superior Court*, 125 Cal. Rptr. 3d 1, 21-24 (Cal. App. 2011).

[39]    *Calef v. Gillette Co.*, 322 F.3d 75, 86 (1st Cir. 2003); *see also Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015) ("An essential function of almost every job is the ability to appropriately handle stress and interact with others. . . . [A]n employee . . . is not qualified when . . . stress leads him to threaten to kill his co-workers . . . ."); *Palmer v. Circuit Court*, 117 F.3d 351, 352 (7th Cir. 1997) ("The [ADA] protects only 'qualified' employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one."). We note that the issue whether an employer can terminate a disabled employee for violating personnel rules governing workplace violence is distinct from the issue whether an employer can terminate a disabled employee who poses a future threat to his or her coworkers. *See* 42 U.S.C. § 12113(b) (explaining that an employer can properly require that its employees "not pose a direct threat to the health or safety of other individuals in the workplace"). This latter issue is not implicated in the present case as Nicolos was terminated for his violation of the personnel rules, not for the future threat he may have

(continued...)

furnish a lawful ground for the employee's termination even if the violation stems from the employee's disability.

Some conditions must be satisfied, however, for an employer to lawfully terminate an employee for violation of workplace violence rules when the violation results from the employee's disability. First, the rule that the employee has violated must be "job-related for the position in question and . . . consistent with business necessity."[40] Thus, "an employer may not hold a disabled employee to precisely the same standards of conduct as a non-disabled employee unless such standards are job-related and consistent with business necessity."[41] As just noted above, this condition will typically be satisfied when the employee violates a workplace violence policy because compliance with that policy is job-related and necessary.

Second, the employee's failure to adhere to the workplace violence policy cannot be the result of the employer's failure to reasonably accommodate the employee.[42] But "[b]ecause reasonable accommodation is always prospective, . . . an employer is not required to excuse . . . misconduct" that occurred *before* the employer was aware of the

---

**39**    (...continued)
posed.

**40**    EEOC GUIDANCE, *supra* note 38, 1997 WL 34622315, at *14 (citing 42 U.S.C. § 12112(b)(6)); *see also* 42 U.S.C. § 12113(a).

**41**    *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1086 (10th Cir. 1997) (emphasis omitted).

**42**    EEOC GUIDANCE, *supra* note 38, 1997 WL 34622315, at *15; *see Moody-Herrera v. State, Dep't of Nat. Res.*, 967 P.2d 79, 87 (Alaska 1998) ("[AHRA] imposes a duty on an employer to reasonably accommodate a disabled employee.").

need for reasonable accommodation.[43]  Third, "collateral assessment of disability [must] play[] no role in the decision to dismiss."[44]  In other words, the employee must be discharged due to a violation of the workplace violence policy, not due to a disability.

**2.     The Board properly found that Nicolos was not capable of performing the essential functions of his position due to his violations of personnel rules concerning workplace violence.**

As explained above, substantial evidence supports the Board's finding that Nicolos told a counselor that he had a premeditated plan to kill his supervisor, coworker, and others.  This finding, combined with the undisputed evidence about Nicolos's earlier conversation with his supervisor, justified the Board's conclusion that Nicolos had violated the personnel rules on workplace violence.  These violations were the basis for Nicolos's discharge.

We conclude the Board properly determined that Nicolos's violation of the Borough personnel rules on workplace violence rendered him no longer " 'otherwise qualified' to perform the essential duties of his job."  First, a rule prohibiting employees from making threatening statements or engaging in behavior threatening to other employees is consistent with business necessity.  Moreover, the Board determined that "there was no reasonable accommodation that could be made for [Nicolos], as his co-workers would always be in fear for their safety."  This determination is supported by

---

**43**     EEOC GUIDANCE, *supra* note 38, 1997 WL 34622315, at *15; *see also* *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017); *Palmer*, 117 F.3d at 353 ("[W]e cannot believe that th[e] [reasonable accommodation] duty runs in favor of employees who commit or threaten to commit violent acts. . . .  It would be unreasonable to demand of the employer either that it force its employees to put up with this or that it station guards to prevent the mentally disturbed employee from getting out of hand.").

**44**     *Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 280 (5th Cir. 1998).

Pili's and Toalston's testimony and also consistent with a common-sense understanding of human nature.[45]

Finally, the Board found that Nicolos did not prove he "was terminated because of his disability" and that the evidence instead showed he was terminated "because of [his] misconduct, which may have resulted from his disability." In other words, the Board found that Nicolos was not terminated on the basis of prejudice. Nicolos does not argue, and has not shown, that he was terminated due to prejudice against him as a disabled person.

Thus, the Board's findings support its determination that the Borough did not violate the ADA or the AHRA. Nicolos disputes this conclusion, however. His argument, similar to the one we addressed in Part IV.B.3, *supra*,[46] is that he "did . . . not engage in any 'misconduct' " but instead engaged in proper help-seeking behavior that unfortunately happened to frighten his supervisor and coworker. Nicolos analogizes his

---

[45]     The Board's reasonable accommodation finding perhaps does not account for the possibility that Nicolos could be transferred to another department. But even if it is deficient in this way, the deficiency does not warrant reversal because the reasonable accommodation finding was superfluous. Reasonable accommodation is prospective, and since the Borough had properly decided to terminate Nicolos on the basis of his *past* failure to adhere to the personnel rules governing workplace violence, there was no need to reasonably accommodate him. Nicolos has not argued — and has not shown — that he gave notice of his need for reasonable accommodation *before* he engaged in threatening conduct. Toalston was aware of Nicolos's depression and was perhaps aware of his disability more generally. But to trigger the Borough's duty to provide reasonable accommodation, Nicolos needed to "make clear [to the Borough] that [he] want[ed] assistance for his . . . disability." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (quoting *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003)); *see also* EEOC GUIDANCE, *supra* note 38, 1997 WL 34622315, at *10.

[46]     *See also supra* note 18.

case to *Walton v. Spherion Staffing LLC*,[47] which he asserts stands for the principle that "expressing a desire for help and then seeking that help does not in itself constitute misconduct sufficient to overcome the ADA's protections." *Walton* arguably does stand for the principle that a reasonable jury *could* find that asking for help, even in a way that frightens others, does not constitute misconduct sufficient to overcome the ADA's protections.[48] But the Board found that Nicolos did more than ask for help — it found that he told Webb that he had a premeditated plan to harm or kill his coworkers — and thus the principle from *Walton* does not help him.

## V.   CONCLUSION

We AFFIRM the judgment of the superior court approving the Personnel Board's discharge decision.

---

[47]   152 F. Supp. 3d 403 (E.D. Pa. 2015).

[48]   *See id.* at 406.